PAUL LAVERENTS, Plaintiff and Appellant,

v.

MILTON V. GATTIS and IRENE M. GATTIS, his wife, Defendants and Respondents.

(No. 2285; Aug. 15, 1944; 150 P. 2d 867.)

For the plaintiff and appellant there was a brief by Charles E. Lane and William O. Wilson, both of Cheyenne, Wyoming, and oral argument by Mr. Lane.

For the defendants and appellants there was a brief by John C. Pickett and Norman B. Gray, both of Cheyenne, Wyoming, and oral argument by Mr. Gray.

## OPINION

BLUME, Justice.

This action was brought on April 18, 1942, by the plaintiff, Paul Laverents, against the defendants, Milton V. Gattis and Irene M. Gattis, his wife, and was based upon the fraud and deceit of the defendants. The case was tried without the intervention of a jury. The court on April 21, 1943, entered judgment in favor of the defendants and from that judgment the plaintiff has appealed to this court.

The basic facts, as shown by the evidence and as found by the court, and without at this moment entering into the controversial facts herein, are substantially as follows:

Plaintiff had been in the real estate business practically all his life, and he testified that he had some legal training. Defendant Milton V. Gattis was a mechanic working for the United Air Lines. On or

about November 10, 1938, after negotiations carried on for a number of days previously, the plaintiff and the defendants herein entered into an oral agreement for the exchange of properties situated in the City of Cheyenne, Wyoming. The plaintiff was then owner of Lot 12, Block 13, in the Holdredge Addition to the City of Cheyenne. He had erected a building on the premises which was not paid for. The property was valued between the parties at the sum of $5,500. An arrangement had been made for the plaintiff to pay for the building through a mortgage guaranteed by the Federal Housing Administration for the sum of $4,300, which mortgage was subsequently executed by the defendants. The plaintiff, accordingly, had an equity in the property of substantially the sum of $1,200. The defendants were in possession of Lot 4, Block 310, in the City of Cheyenne. They were in possession in pursuance of a written contract from one Tucker. It was agreed between the parties that the property was of the value of approximately $2,500. $840.00 had been paid on the property under the contract. Improvements of the amount of approximately $600.00 had been made thereon, and it was understood by the parties that the defendants had an equity in the property substantially in the sum of $1,200. It was agreed that the contract which the defendants held from Tucker should be turned over to the plaintiff, he assuming further responsibility thereunder. In other words, the agreement substantially was to the effect that plaintiff's equity in his property should be turned over to the defendants in exchange for the equity of the defendants in their contract, the mortgage to the Federal Housing Administration to be executed by the defendants. On November 19, 1938, the defendants, with the permission of the plaintiff, moved into the Laverents property, namely Lot 12, Block 13, above mentioned; they have been in pos-

session thereof ever since and have made improvements thereon valued at $400-$500. The plaintiff did not on that day take possession of the property theretofore held by the defendants. The payments on the Tucker contract were due on the 20th day of each month in the sum of $20 per month. The last payment made on that contract had been made on September 20, 1938. A payment was due on October 20 following which was not paid. The contract provided for a period of 30 days' grace, during which no default would exist in the payments on the contract, so that the time of grace expired on November 20, 1938. The payment was not made at that time, and when on November 21, 1938, plaintiff and the defendant, Milton V. Gattis, went to the house, Tucker, who in the meantime had taken possession, refused to let them enter, and an offer by Gattis to pay the $20 then delinquent was refused. On the following day Tucker served a notice of cancellation of the contract on both plaintiff and on the defendants. A few days thereafter plaintiff met Tucker, who agreed to reinstate the contract to be in full force and effect if the plaintiff would pay the sum of $100 to be applied on the contract. Plaintiff did not pay the money and approximately a month thereafter Tucker refused to accept the payment of $100. On December 17, 1938, however, notwithstanding what has been stated, plaintiff made and executed to the defendants a warranty deed for what is hereinbefore called the Laverents property, namely, Block 12 of Lot 13, above mentioned. About that time defendants executed the mortgage of $4,300 above mentioned to pay for the balance still due thereon, and they have ever since that time made the periodic payments due thereunder. Plaintiff had not up to the time of the trial of this case received possession of Lot 4, Block 310, above mentioned, being the property formerly held by the defendants under contract. And

the question herein is by whose fault that came about.

The first controversial fact is as to who was to make the payment due October 20, 1938. Plaintiff, pleaded that defendants were to give him sufficient title to Lot 4 under an undefaulted contract of sale. The plaintiff testified that Gattis said nothing about the payment due October 20, 1938; that he was to assume the balance of the payments due on the contract when defendants moved into the Laverents property and when the contract held by the defendants was assigned to plaintiff. He claimed that he did not see the written contract held by the defendants, although he admitted that he might have examined the duplicate contract held by Tucker and that he might have taken the figures shown upon that contract. The defendants testified that the plaintiff examined the contract, that the payments made thereon were shown on the back of that contract. Mrs. Gattis testified, "I have a very distinct picture in my mind of Mr. Laverents and my husband sitting on the davenport looking over the contract. I can't say what date it was,—whether it was the first meeting, the second one or the third one." Mr. Gattis testified, "Q. What was the deal? A. In regards to accepting my property over on 1601 E. 20th (Lot 4) as a down payment on this property at 800 W. 2nd Avenue (Lot 12) and he was to assume the balance of the mortgage on the 1601 property, also he was to make all the payments effective as of October 20. Q. Why of October 20. A. That was the agreed date that my responsibility was to cease there and he was to take over. * * * Mr. Laverents agreed to take over the payments to Mr. Tucker as of October 20, 1938. We had a grace period in there. I was explaining to Mr. Laverents he would have to use the payment to negotiate a loan with the F.H.A.; that was all right with Mr. Laverents. Mr.

Laverents was to make the payment to Mr. Tucker and that is where Mr. Laverents neglected to do so. Well, I proceeded to caution Mr. Laverents in regard to that and Mr. Laverents politely informed me that he knew what he was doing and that he would absolutely take care of it. Q. In what didn't he (Laverents) comply with it (the contract)? A. First of all, he neglected to make the agreed payment at the specified time when he agreed to make it, thereby the contract became delinquent. Mr. Laverents not only failed to carry out with it there, but he also failed to carry out in regard to his promise with his property up there. In no way did Mr. Laverents carry through his stoker." Mrs. Gattis testified on cross-examination: "Q. There has been a deep mystery about this October 20 payment. Why wasn't that made? A. It was as my husband testified. We needed the money to consummate the loan. We had to go ahead with the negotiations with that money, because we paid for the loan. You know you have to deposit something with the Federal Mortgage along with your expenses to pay for the costs of the loan." The court did not make any specific finding on who was to make the payment but no complaint is made in that connection. We are not able to say that the testimony on behalf of the defendants was false and if that testimony is correct there can be no doubt that the plaintiff was to make the payment due October 20, 1938; that he neglected to do so, and hence the loss of his property cannot, in the absence of other facts, be said to be due to the fault of defendants.

The contention of counsel for plaintiff, however, seems to be, that until the contract with Tucker was assigned to the plaintiff in writing, plaintiff had no rights thereunder, and while it is not clear, the contention appears to be, inferentially, that plaintiff had

no right, until that time, to make the payment of $20 due October 20, 1938. In fact the main argument herein appears to revolve round the point of the lack of such assignment, and in that connection we come to other controversial facts. A written assignment apparently was never made, although the testimony shows and the court found that the duplicate contract held by the defendants was delivered to the plaintiff sometime in the early part of January, 1939. When the period of grace on the payment due on October 20 had expired, Tucker, as already stated, took possession of the property and refused to let the plaintiff enter. Plaintiff and the defendant Milton V. Gattis, thereafter went to call on Mr. Laughlin, an attorney at law, in connection with the notice of cancellation sent by Tucker to both plaintiff and the defendants. The testimoney in regard to this point is very conflicting. The plaintiff testified that Mr. Gattis said he would go to Mr. Laughlin; that Mr. Gattis went; that Mr. Laughlin was to see Mr. Tucker's attorney and report back but that he (the plaintiff) never heard anything further about it; that he saw Mr. Gattis afterwards at numerous times about arranging to get back the property and deliver the possession to plaintiff; that Mr. Gattis usually, however, gave him an indefinite answer; that he stated he would see to it, and that he (plaintiff) took it for granted he was hiring an attorney to straighten things out. And counsel for the plaintiff argue strenuously and make the statement at numerous times that in view of the fact that no written assignment of the contract had been made to the plaintiff he was helpless and was absolutely unable to do anything about it; that it was the duty of the defendants to cause the contract to be reinstated. The testimony of the plaintiff is wholly contradicted by the testimony of Mr. Gattis. He testified, "Q. How were you to transfer this Tucker contract to Mr. La-

verents? A. The Tucker contract was unrecorded and Mr. Laverents explained to me that there was no assignment there, because he looked it over and he said all he would have to do was him take over the property and continue making the payments, and that was all that was necessary. Q. You didn't give him any bill of sale or assignment? A. No, sir. He told me it was absolutely not necessary. Q. And state what he, Laverents, did with the contract? A. I showed Mr. Laverents the contract and we looked it over. Particularly Mr. Laverents noticed to see if there was anything in the contract that stated that we had to have the approval of Mr. Tucker in order to negotiate this deal, and he informed me that there was nothing in the contract,— that he was familiar with law and that there was nothing in the contract that said I had to have Mr. Tucker's approval. Q. When you were dealing with Mr. Laughlin you told him you had a lawful right to deliver said premises under the contract of sale, did you not? A. Mr. Laverents and I arrived at that conclusion when he looked over the contract at my house. He seemed to know so much about law that I felt that his was good advice. Q. Did you ever do anything to aid Mr. Laverents to get this house back from Mr. Tucker? A. No, sir, because Mr. Laverents told me that he would handle the deal. * * * I took Mr. Laverents up to Mr. Laughlin's with me, and said before Mr. Laverents there what had hapened, more or less asking Mr. Laughlin's advice, and then Mr. Laverents took over the floor and practically told me to keep out of it, that he knew what he was doing, that he had experience in law, and told Mr. Laughlin that he, Paul Laverents, would handle the deal, that he could handle Mr. Tucker."

Assuming the testimony of Mr. Gattis to be true, as we must in view of the judgment in his favor in the

court below, the plaintiff did not ask for a written assignment of the Tucker contract and thought it to be unnecessary, and plaintiff furthermore undertook to reinstate the defaulted contract, and relieved the defendants from the burden of doing so. That would seem to dispose of every argument made by counsel for the plaintiff herein.

We think moreover, that the legal conclusions which counsel for plaintiff draws from the fact that no written assignment was made, are not well taken. He stated that "it is almost elementary that the assignment of a purchaser's interest under a land contract must be in writing to be effective." And he cites us, among other cases, to Wilkie v. Womble, 90 N .C. 254; Connor v. Tippett, 57 Miss. 594. These cases are not at all in point. They deal with the enforcement of an oral contract relating to real estate as between the parties themselves. We have no such case here. In the case at bar, Tucker was a stranger to the oral contract made between the plaintiff and the defendants. It is a general rule that the defense of the statute of frauds is personal and cannot be interposed by strangers to the agreement. 27 C.J. 304; 37 C.J. 715. In 49 Am. Jur. 896, it is stated:

"The defense of the statute of frauds is a personal one available only to a party to the contract to which the statute is alleged to apply and his representatives and privies. The statute is intended for the protection of the party sought to be charged. It does not make it inherently wrong for a party to enter into an oral contract concerning a subject matter coming within the meaning of the statute. In fact, in most jurisdictions, by its terms or by necessary implication, the statute merely makes an oral contract voidable as a protection to those who might otherwise suffer by reason of pretended oral promises; generally, it may be said that the statute is not intended to be the means of preventing voluntary fulfillment of the moral obli-

gation created by the oral agreement. Its benefits cannot be claimed by one who is not a party or privy to the oral contract and is not sought to be charged personally on such contract.

"As has been said, it does not rest with a stranger to say that the parties to the oral agreement will not abide by the same regardless of the statute; it is for the party himself (or his privy) to decide whether he shall avail himself of the defense. If he feels that he should discharge the moral obligation although he may have a perfect legal defense, no stranger or third party not privy to the contract can complain. This rule applies even under statutes which provide that such agreements are void unless reduced to writing and signed by the party charged. It ordinarily prevents even creditors of a party to the contract from asserting the benefit of the contract."

In Browne on the Statute of Frauds (5th Ed.) § 135, it is said:

"As the Statute of Frauds affects only the remedy upon the contract, giving the party sought to be charged upon it a defence to an action for that purpose, if the requirements of the statute be not fulfilled, it is obvious that he may waive such protection; or rather, that, except as he undertakes to avail himself of such protection, the contract is perfectly good against him. A third party cannot, in a case where his own obligations growing out of the existence of the contract in question are concerned, deny the obligation of the contract upon the party who was to be charged thereby, or take any benefit of the protection which such party could claim in an action brought upon it against himself."

In Hirt v. State Bank, 153 Kan. 194, 109 P. 2d 171, the court stated that "if an agreement should be in writing, but is merely oral, that is a matter of no consequence to third parties." It has been held that in a suit by an assignee of a lease against the lessor for breach of the lease by the latter, such lessor cannot take advantage of the fact that the assignment of the

lease was not in writing. Gilbert Hotel No. 22, Inc. v. Black, 67 Ga. App. 221, 19 S.E. 2d 796; B. Roth Tool Co. v. Champ Spring Co., 93 Mo. App. 530, 67 S.W. 967. See also Draper v. Wilson, 143 Wis. 510, 128 N.W. 66, 21 Ann. Cas. 1387 and Annotation; Cowan v. Adams, 1 Fairf. (Me.) 374; Norton v. Simonds, 124 Mass. 19, Annotation 127 A.S.R. 756. A lease for a term, with stated payments from time to time, is similar to a contract of sale, which provides for payments to be made from time to time. The Tucker contract is not in the record. So far as the facts before us show, no written assignment was necessary. In fact, according to the testimony of Mr. Gattis, that is what plaintiff thought and believed and stated, and he was advised by an attorney that the contract could, legally, be reinstated. Gattis and the plaintiff went to the house, held by defendants under contract with Tucker, in order to deliver possession thereof to the plaintiff, so that the contract between the plaintiff and the defendants might be carried out. They did all they could do to effect such delivery and were prevented only by the acts of Tucker, which, according to plaintiff's theory and belief, were wrongful, and of which, accordingly, Tucker could not take advantage, in setting up the statute of frauds. It is held that a stranger to a contract who wrongfully interferes with the performance of an oral contract cannot set up that the contract was within the statute of frauds. Ringler v. Ruby, 117 Or. 445, 244 P. 509, 46 A.L.R. 245; Nokol Co. v. Becker, 319 Mo. 292, 300 S.W. 1108; Kamm v. Flink, 113 N.J.L. 582, 175 Atl. 62, 99 A.L.R. 1. In Vaught v. Jonathan L. Pettyjohn & Co., 104 Kan. 174, 178 P. 623, the court stated:

"A third party cannot make the statute of frauds available as an excuse for his wrongful conduct which interferes with and prevents the consummation of a transaction between other persons. The statute cannot

be raised by those who were neither parties nor privies to the agreement. When the vendor admits the truth of the oral agreement to sell his land, and is willing to perform it, and where the purchaser is also willing, the purpose which requires such agreement to be in writing is served, and the want of the writing is no concern of others. Nor can third parties escape the consequences of their wrongful intermeddling which prevents the consummation of the transaction."

In 27 R.C.L. 733, it is said that "one who wrongfully seizes and retains goods claimed by another under a contract, unenforceable against the previous owner on account of the statute, cannot, according to the better view set up the defense that the contract was within the statute."

It would seem that under the facts and the authorities here cited, the contention that since the contract was not assigned in writing the plantiiff was not authorized to make the payment of $20.00, due October 20, 1938, or that he was not authorized to sue Tucker for the reinstatement of the contract and the delivery of possession of the property to him, is not well taken.

Ordinarily, in the regular course of business, the Tucker contract would, of course, have been assigned in writing, and we are not altogether satisfied why that was not done. The contract is not in the record. The court and opposing counsel several times asked counsel for the plaintiff to produce it, and he stated that it would be produced in due course of time, but the plaintiff, when on the witness stand, testified that he never received it, though defendant's testimony shows and the court found that it was delivered to him. For all we know, no written assignment was necessary. An oral assignment may have been sufficient, and such assignment was given by and through the terms of the oral contract entered into November 10, 1938. In any event, plaintiff was a business man, with

many years of experience in the real estate business, and why he did not look after his own interests better is almost incomprehensible, unless some facts exist which do not appear in the record. Not alone had plaintiff an opportunity, as above stated, to pay the $20 to prevent delinquency in the Tucker contract, and bring suit to see if that contract could be reinstated, but he was given the chance, as shown by the testimony, and as specifically found by the court, to pay $100 on the contract in order to reinstate it in force. He failed and neglected to do so, waiting a month or more, until Tucker then refused to accept the payment. When he was asked why he delivered the deed of December 17, 1938, he stated: "Well, there were several things that hinged on that subject. In the first place, they were in possession of my property that I delivered to them. They had a perfect right to move in and there was no way of getting them out. And in the second place the information we received was there was a cause of action against Mr. Tucker, that the property would be restored to its original form." He further stated that he had been advised to that effect by an attorney, but that he did not have the contract with Tucker, and so could do nothing. But he seemingly did not even ask for the contract until January, 1939. And he apparently made no complaint until the next fall, when he put the matter in the hands of an attorney, who, after investigating the matter, dropped it, and nothing further was done until this case was commenced. He clearly recognized the contract with defendants to be in force and effect when he made the deed to the defendants. He appeared to be entirely satisfied with the situation at that time. He had the right, as already shown, to bring an action against Tucker. Yet he did nothing, and it would now be clearly unjust to blame the defendants for his own negligence. Counsel for plaintiff have re-

ferred to statements made in the answers which Gattis made in connection with the loan from the Federal Housing Administration. That statement is not in the record; it was attached to the motion for a new trial. We have examined it, however, and fail to see the importance of these statements. A number of statements are made in the brief of counsel for plaintiff, which we have not thought necessary to mention. Some of them are based on the assumption that the testimony of the defendants is not true. But the truth or falsity thereof was for the trial court to determine. We have set forth the main and determinative facts in this case and we are unable to say that the court was not justified in entering judgment for the defendants, and it is, accordingly, confirmed.

*Affirmed.*

KIMBALL, C. J., AND RINER, J. concur.