2010 WY 82

**COMET ENERGY SERVICES, LLC, a Nevada limited liability company, Appellant (Defendant),**

v.

**POWDER RIVER OIL & GAS VENTURES, LLC, a Colorado limited liability company, Appellee (Plaintiff).**

No. S–09–0225.

Supreme Court of Wyoming.

June 23, 2010.

Representing Appellant: Thomas F. Reese of Beatty, Wozniak & Reese, Casper, Wyoming.

Representing Appellee: Blake M. Pickett of Welborn Sullivan Meck & Tooley, P.C., Denver, Colorado.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] This matter is before this Court for a second time. In *Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC*, 2008 WY 69, 185 P.3d 1259 (Wyo.2008) (*Comet I*), we reversed the district court's order granting summary judgment for Powder River Oil & Gas Ventures, LLC (Powder River) and remanded the matter for trial, concluding that the term "leasehold estate" as used in the oil and gas assignment at issue was ambiguous, and a question of fact existed as to the extent of Powder River's ownership interest in the well and/or lease it had purchased from Forcenergy Onshore, Inc. (Forcenergy). On remand, the district court concluded after a bench trial that Powder River owned the lease at issue in full and Comet Energy Services, LLC (Comet) had no interest in the lease. Comet appealed. We affirm.

## ISSUES

[¶ 2] Comet presents two issues for this Court's determination:

    A. Does the District Court's admission of and reliance on testimony of the parties' own extrinsic expression of intent as to the meaning of a contract constitute reversible error?

    B. Is the District Court's holding that the Assignment, Bill of Sale and Conveyance from Forcenergy to Appellee satisfies the Statute of Frauds reversible error?

Powder River asserts the district court correctly found the intent of the assignment was to convey all of the assignor's interest in the well and associated lease to Powder River and that the assignment does not fall within the statute of frauds.

## FACTS

[¶ 3] In August of 1998, Powder River purchased Forcenergy's interest in an oil and gas well located on a federal oil and gas lease in Wyoming. The granting clause of the assignment from Forcenergy to Powder River (1998 Assignment) stated as follows:

Assignor hereby transfers, grants, conveys and assigns to Assignee all of Assignor's right, title and interest in and to the following (all of which are herein called the "Interests"):

    1. The oil and gas well(s) described on Exhibit "A" attached hereto ("Wells"), together with all equipment and machinery associated therewith;

    2. The leasehold estate created by the lease(s) upon which the Wells are located and/or pooled/unitized therewith ("Leases") and all licenses, permits and other agreements directly associated with the Wells and/or Leases;

    3. All the property and rights incident to the Wells, and the Leases, including, to the extent transferable, all agreements, surface leases, gas gathering contracts, salt water disposal leases and wells, equipment leases, permits, gathering lines, rights-of-way, easements, licenses and all other agreements directly relating thereto; and

4. All of the personal property, fixtures and improvements appurtenant to the Wells or used or obtained in connection with the operation of the Wells.

*Comet I*, ¶ 7, 185 P.3d at 1262. Exhibit A to the 1998 Assignment stated:

This Exhibit "A" contains the description of the wells/units with such description intended to incorporate all of Seller's/Assignor's interest in such wells/units and is not intended to be limited to Assignor's/Seller's interest in the geographic boundaries of the specific spaced/drillsite unit description therein.

| State/County | Location | Well/Unit Name | Field |
|---|---|---|---|
| Wyoming/Campbell | 4-53N-75W | Federal 44-4 | Black Hill |

*Id.*

[¶ 4] Over six years later, in January 2005, Comet contacted Powder River to inquire about purchasing its interest under the 1998 Assignment. At some point during the discussions between Comet and Powder River concerning the sale, a question arose in Comet's view as to the nature and extent of the interest Forcenergy had conveyed to Powder River. Despite Powder River's position that it owned the lease and the well in full, Comet conducted additional investigation in an attempt to ascertain what interest Powder River held as a result of the 1998 Assignment.

[¶ 5] In June of 2005, Comet contacted Forcenergy to determine what interest it had conveyed to Powder River in the 1998 Assignment. Forcenergy advised Comet that it had no records of the lease or any ownership of it. Comet did further checking with the Bureau of Land Management (BLM) and the county and then suggested to Forcenergy that it had conveyed only a wellbore interest and retained the balance of the 760–acre lease. Comet asked Forcenergy to quitclaim the remaining interest to Comet. On August 2, 2005, on the basis of Comet's suggestion, Forcenergy conveyed to Comet any remaining interest it had in the lease without warranting title. In August of 2005, Comet recorded this assignment with the BLM and subsequently informed Powder River of the assignment.

[¶ 6] On November 3, 2005, Powder River filed a declaratory judgment action seeking a determination that "as between Powder River and Comet, Powder River owns all right, title, and interest to the Subject Interest conveyed by [Forcenergy] and that Comet does not own any right, title or interest in

the same." On December 29, 2005, Comet filed its answer and a counterclaim seeking a counter-declaration that Powder River obtained only a wellbore interest under the 1998 Assignment, and that Comet acquired the balance of Forcenergy's interest in the lease in 2005. Powder River filed a motion for summary judgment on September 14, 2006. Comet responded to Powder River's motion and filed a cross-motion for summary judgment on November 1, 2006. The district court held a summary judgment hearing on November 6, 2006, and entered an order granting summary judgment in favor of Powder River on February 6, 2007.

[¶ 7] Comet appealed to this Court, claiming the district court incorrectly interpreted the 1998 Assignment as conveying all interest in the lease to Powder River. We concluded:

[T]he district court improperly determined that summary judgment was appropriate under the facts of this case. The term "leasehold estate," as used in the 1998 Assignment, is ambiguous. This ambiguity gives rise to a genuine issue of material fact concerning the intent of the parties to the assignment.

We reversed the summary judgment order and sent the matter back to the district court for trial.

[¶ 8] Back in the district court, Powder River submitted evidence to show that Forcenergy intended the 1998 Assignment to convey all of its right, title and interest in the Federal 44-4 well and the federal lease on which it was located. Comet countered with evidence intended to show that Forcenergy only conveyed a wellbore/drilling unit and not the balance of the lease. After considering all of the evidence, the district court found that Forcenergy intended to convey all of its

interest in the well and the lease to Powder River and Comet had no remaining ownership interest in the lease. The district court entered judgment for Powder River. Comet appealed.

## STANDARD OF REVIEW

[¶ 9] Our review of a district court's ruling after a bench trial is governed by the following standards:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Cook v. Eddy*, 2008 WY 111, ¶ 6, 193 P.3d 705, 708 (Wyo.2008) (internal citations omitted).

[W]e assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Id.* The district court's conclusions of law, however, are subject to our *de novo* standard of review.

*Lieberman v. Mossbrook*, 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo.2009).

[¶ 10] We review the trial court's decisions concerning the admissibility of evidence for abuse of discretion. *Smyth v. Kaufman*, 2003 WY 52, ¶ 13, 67 P.3d 1161, 1165 (Wyo.2003). The ultimate question in determining whether an abuse of discretion

has occurred is whether the trial court reasonably could have concluded as it did. *Id.*

[¶ 11] Comet also challenges the district court's determination that the 1998 Assignment satisfied the statute of frauds and, in any event, the defense was not available to Comet. The determination of whether a given agreement is within the statute of frauds is a question of law which we review *de novo*. *Act I, LLC v. Davis*, 2002 WY 183, ¶ 9, 60 P.3d 145, 148–149 (Wyo.2002).

## DISCUSSION

### 1. Admissibility of the Evidence

[¶ 12] Comet contends the district court improperly considered inadmissible evidence in concluding that the 1998 Assignment gave Powder River all right and title to the lease. Specifically, Comet asserts the district court allowed testimony over its objection concerning the subjective intent of Forcenergy and Powder River when they entered into the assignment. Powder River responds that the district court properly considered evidence of the circumstances surrounding the assignment, its purpose and the commercial setting at the time.

[¶ 13] Assignments are contracts and are interpreted in accordance with the rules of contract interpretation. *Boley v. Greenough*, 2001 WY 47, ¶ 11, 22 P.3d 854, 858 (Wyo.2001). Our primary purpose is to determine the true intent and understanding of the parties at the time and place the agreement was made. *Stone v. Devon Energy Prod. Co., L.P.*, 2008 WY 49 ¶ 18, 181 P.3d 936, 942 (Wyo.2008). We consider the language in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made. *Id.* Relevant circumstances considered in determining the parties' intent may include the relationship of the parties, the subject matter of the contract, and the parties' purpose in making the contract. *Ecosystem Res., L.C. v. Broadbent Land & Res., L.L.C*, 2007 WY 87, ¶ 10, 158 P.3d 685, 688 (Wyo.2007).

**[¶ 14]** If a contract term is ambiguous, we strive to ascertain its meaning from language in the contract as a whole. *Wunsch v. Pickering*, 2008 WY 131, ¶ 17, 195 P.3d 1032, 1040 (Wyo.2008). We look to the meaning of the term at the time of execution and ascertain the parties' intention by considering all of the contract provisions, as well as the situation of the parties. *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 23, 126 P.3d 909, 919 (Wyo.2006). The plain meaning of a contract's language is the meaning the language would convey to reasonable persons at the time and place of its use. *Id.* A party's subjective intent, however, is not relevant or admissible in contract interpretation; rather, we use an objective approach to contract interpretation. *Omohundro v. Sullivan*, 2009 WY 38, ¶ 24, 202 P.3d 1077, 1084 (Wyo.2009).

In *Omohundro*, we were asked to interpret restrictive covenants. One of the parties offered the affidavit of a member of the company that executed the covenants, in which he averred:

> "[I]t was always the express intent of the ... owners at all times to burden only Tract Nos. 1–5 with the Covenants. To the extent that the Covenants otherwise identify or reference the Tract No. 6[ ] lands, it was always the express intent of the ... owners ... to provide additional protections for the Tract No. 6 parcel but not to burden the Tract No. 6 with the Covenants in any way...."

We said:

> If this averment was intended to be evidence of the declarant's subjective intent with regard to the effect of the covenants on Tract 6, it was not relevant and, therefore, was not admissible. A party's subjective intent is not relevant in contract interpretation cases because we use an objective approach to interpret contracts.

*Id.*, ¶¶ 23–24, 202 P.3d at 1084.

**[¶ 16]** Comet relies on *Omohundro* in asserting that the district court improperly considered evidence of Forcenergy's subjective intent in making the 1998 Assignment. The testimony at issue was that of Melvin Baiamonte, Jr., the land manager for Forcenergy at the time of the assignment. Stating that his testimony was "[m]ost indicative of what the surrounding circumstances were like at the time of conveyance," the district court quoted the following portions of Mr. Baiamonte's deposition testimony in its decision letter[1]:

> [Q. ... Now, if you go to Exhibit A, Exhibit A identifies a well. And in this case it's the Federal 44–4 well, which is listed as identified in Campbell County, Wyoming in Section 4—53 North—75 West.
>
> Can you tell the court why it is that Forcenergy used this particular means of identifying the properties rather than listing out the entire leasehold acreage?]
>
> . . . .
>
> A. Under normal circumstances, an assignment would have not only listed wells but it would have listed all leases and possible related contracts. That's under ideal circumstances.
>
> Forcenergy acquired so many properties via the two corporate mergers in 1997 that came to Forcenergy without the luxury of assignment, of a recorded assignment in individual courthouses. All we had was merger documents. So we had to rely on well lists that the purchased company would provide us. Some of their lease records were good in certain areas, some of them were very weak.
>
> We took a shotgun approach at these auctions because we did not have a valid go-by, if you wish, a cheat sheet, if you wish, to tell us what leases applied to this particular well. So it was our intention when we prepared the blank draft, ... regardless of the purchaser, we took a shotgun approach in that it was our intention to give up whatever we had that applied to this particular well or any particular wells that we sold.
>
> We did not know it, what leases were affected by this well. We did not know

---

1. For the sake of completeness and clarity, we have added, in brackets, the questions and in some cases more of the answers to the portions of the deposition testimony quoted by the district court in its decision letter.

any contracts. We didn't want to warrant anything. So we took, as I said, a shotgun approach. We did not want to spend any money to do title work that, at an EBCO sale, would not generate any more value for us.

. . . .

[Q. Now, can you tell me whether or not this [Exhibit A] is a wellbore assignment of 30 wells?]

A. As I mentioned earlier, this is the same shotgun approach we took on all of these assignments. And that it was our intention to convey all of our interests, whatever interest we had in these wells and leases and any interests we had in units associated with these wells.

. . . .

[Q. Now, with regard to these 26 assignments that were executed in 1998 as a result of the EBCO auction, which has been identified as Exhibit 302, do you recall Forcenergy ever participating or being asked to participate in a well that would have been on any of these leases that were assigned here?

A. I don't recall anything of that nature.] These properties, the low end properties, were treated as orphans within the company. And I don't recall ever—If we would ever have gotten a proposal, we would have had to run around, scratch our heads and figure out what was our ownership. And that was generally pretty bothersome.

. . . .

Q. And after 1998, as land manager for Forcenergy ... to your knowledge, did Forcenergy believe or take the position that it owned the balance of this lease outside of the spacing unit for the Federal 44–4 well?

A. We had no further utility, we had no further right, we had no further interest in this lease.

. . . .

[Q. And it says here, sir, "This Exhibit 'A' contains the description of wells/units with such description intended to incorporate all of Seller's/Assignor's interest in such well/units and is not intended to be limited to Assignor's/Seller's interest in the geographic boundaries of a specific spaced/drillsite unit description therein."

First of all, did you prepare that language?

. . . .

A. I don't remember if I prepared it or one of our other staff members ... prepared it. Either way I was involved with it, reviewing the draft of it. Either I prepared it or I reviewed the draft.

Q. And what does that language mean to you?]

. . . .

A. It was our intention to sell whatever we had associated with the Federal 44–4, whatever we had, any leasehold, any interests we had associated with that particular well.

. . . .

[Q. And, to your knowledge, sir, from 1998 to, let's say, 2000 when you're still dealing with onshore assets, with regard to, first, Exhibit 300, did Forcenergy ever take the position that it still owned any interest in the Federal 44–4 well or the lease upon which it sat?]

. . . .

A. Forcenergy took no ownership interest regarding this well after the sale.

[¶ 17] From this testimony, there is no question but that Mr. Baiamonte testified Forcenergy intended to sell everything it owned in relation to Federal 44–4 when it drafted the assignment. Viewed in its entirety, in the context in which it was given, however, we are not persuaded that Mr. Baiamonte's testimony constituted irrelevant, inadmissible evidence of Forcenergy's subjective intent. Rather, in its entirety and in the context in which it was given, the testimony was properly admissible evidence of the surrounding circumstances, subject matter and purpose of the assignment.

[¶ 18] Mr. Baiamonte testified that he had worked as a lease analyst, land man or land manager for over thirty years. He worked for Forcenergy as land manager from 1991 until 2000 when it was acquired by another company. In 1998, Forcenergy was interested in divesting itself of many of the

oil and gas properties it owned in the Rocky Mountain region, "properties that were not in our core areas, properties that were on the low end value wise, properties that did not generate a lot of cash." In August of 1998, Forcenergy offered for sale at auction numerous of those properties located in seven Rocky Mountain States, including Wyoming. As Forcenergy's land manager at the time, Mr. Baiamonte was responsible for overseeing and directing the sale of these properties. He executed the 1998 Assignment and attested that Powder River had no role or involvement in drafting the terms of the assignment. Rather, it was one of approximately twenty-six identical form assignments drafted by Forcenergy. The only differences in the forms were the assignee names and the well numbers and descriptions.

[¶ 19] Mr. Baiamonte testified that the 1998 Assignment for which Powder River was the high bidder, like the other twenty-five assignments, conveyed the well, the leasehold estate created by the lease upon which the well was located, and all of Forcenergy's interest in the well and lease. He stated it was not a wellbore assignment. He testified that he has drafted and executed many wellbore assignments and there is nothing in the language used in the 1998 Assignment identifying it as a wellbore assignment. He testified that under normal circumstances assignments like those Forcenergy prepared for the 1998 auction would have listed the well and the lease. However, in 1997, Forcenergy acquired numerous properties as a result of corporate mergers that came without recorded assignments. Forcenergy only had the merger documents and so it relied on the well lists the purchased company provided. Because the properties were low end, Forcenergy did not want to spend money doing title work on properties that were going to auction and would not generate any more value to it.

[¶ 20] Mr. Baiamonte was actively involved in preparing the assignments and made the decision to identify the properties for auction by well number. As was customary, Forcenergy provided the lease files for each of the properties to the auction house for review by potential purchasers. The lease files were not returned to Forcenergy unless the particular property did not sell at auction. Mr. Baiamonte testified that after the twenty-six assignments it offered at the 1998 auction were executed, he was not involved in managing the assigned properties and Forcenergy never drilled a well on any of the properties. Addressing specifically the assignment of Federal 44–4, Mr. Baiamonte testified that after the 1998 Assignment, Forcenergy had no further right, no further interest in the lease. Garth Berkeland, who went to work as a senior landman for Forcenergy's successor company in 2002, testified that the company had no records of the lease.

[¶ 21] In addition to the foregoing testimony, Powder River presented the 1998 auction brochure. The brochure includes an "Explanation of Terms" which sets out the abbreviations used in the property descriptions and their meaning. The first abbreviation in the "Explanation of Terms" is "WBO/PDZ" which is stated to mean "WELL BORE/PROD ZONE ONLY." Some of the property descriptions include the abbreviation WBO; the property description for Federal 44–4 does not. Mr. Baiamonte testified Federal 44–4 did not include the abbreviation because Forcenergy never conveyed any wellbore assignments at auction.

[¶ 22] Powder River also presented the testimony of Stephen Barnes, the owner of an oil and gas exploration and production company with twenty-six years of experience in the oil and gas industry, including the acquisition of oil and gas leases. Mr. Barnes, like Powder River, attended the 1998 auction and purchased property from Forcenergy. As with Powder River's purchase, the property Mr. Barnes purchased was described in the auction brochure by the well name and number and did not include any of the abbreviations set out in the "Explanation of Terms." The form of assignment by which Forcenergy conveyed its interest to Mr. Barnes was identical to the one involved in the present case. Mr. Barnes testified that he understood from the listing and the assignment that he was getting all of Forcenergy's interests, right and title in the area, including the wellbore and the lease on which

it was located. When asked to look at the Federal 44–4 brochure description, he testified there was nothing in the description indicating that the interest conveyed was limited to the wellbore or the production zone.

[¶ 23] Considered in context, this evidence is precisely the sort of evidence courts may properly consider in determining the parties' intent and understanding at the time and place an agreement was made. Mr. Baiamonte's testimony explaining Forcenergy's reason for offering the twenty-six assignments at the 1998 auction, the process by which the assignments were drafted and why the property descriptions were limited to well descriptions, rather than well and lease descriptions, was the sort of evidence this Court contemplated when we remanded the case for resolution of the meaning of the term "leasehold estate".

[¶ 24] The record is clear that along with his other testimony, Mr. Baiamonte testified that "it was our intention to give up whatever we had that applied to this particular well," "it was our intention to convey all of our interests," and "it was our intention to sell whatever we had associated with the Federal 44–4." Viewed in isolation, these statements might be construed, as similar statements were in *Omohundro,* as evidence of Forcenergy's subjective intent. However, when considered in the context of Mr. Baiamonte's entire testimony, the auction brochure and Mr. Barnes' testimony, they are not the sort of evidence we found improper in *Omohundro.* The district court did not abuse its discretion in considering them.

## 2. Statute of Frauds

[¶ 25] In its second issue, Comet contends the district court's holding that the assignment satisfied the statute of frauds constitutes reversible error. Comet asserts the assignment did not satisfy the statute of frauds because it did not describe the land with sufficient definiteness "to locate it without recourse to oral testimony" and there was no other instrument referenced in the assignment containing a sufficient description. Comet argues that, to satisfy the statute of frauds, Wyoming law requires either the assignment itself or another writing referenced in the assignment to provide a more definite description than that contained in the 1998 Assignment or Exhibit A.

[¶ 26] Powder River's response is threefold. First, it asserts the assignment did not violate the statute of frauds because it identified the well and its location and with that information interested parties could reference the federal lease, which contains an exact description of the property. Citing *Flygare v. Brundage,* 76 Wyo. 350, 302 P.2d 759, 761–63 (1956), Powder River contends the fact that the property description could be determined by looking to an extrinsic source, i.e. the federal lease, satisfies the statute of frauds. Second, Powder River contends the statute of frauds defense is not available to Comet because Comet wrongly interfered in Powder River's agreement with Forcenergy. Third, it asserts the defense is unavailable to Comet because it was not a party to the 1998 Assignment.

[¶ 27] The district court held that the 1998 Assignment satisfied the statute of frauds because it was a written agreement to which Forcenergy and Powder River subscribed as required by Wyo. Stat. Ann. § 1–23–105 (LexisNexis 2009). The district court concluded the statute of frauds does not require the written agreement to be so detailed as to leave out any ambiguity. The district court further concluded the statute of frauds defense was not available to Comet because it was not a party to the assignment. Additionally, the district court found that the defense was not available to Comet because:

> The evidence indicates that Comet, knowing Powder River believed they had full ownership interest in the lease, and even indicating themselves that they believed Powder River had full ownership interest in the lease, went to Forcenergy and had Forcenergy execute a quitclaim deed. Comet then asserted to Powder River that the rights in the lease belonged to Comet.

From this evidence, the district court concluded Comet interfered with the agreement between Powder River and Forcenergy and was not allowed to assert the statute of frauds as a defense. *See Laverents v. Gattis,* 60 Wyo. 285, 150 P.2d 867, 871 (Wyo.1944), stating that "one who wrongfully seizes and

retains goods claimed by another under a contract, unenforceable against the previous owner on account of the statute, cannot, according to the better view set up the defense that the contract was within the statute."

[¶ 28]    Section 1–23–105 provides in pertinent part as follows:

> (a) In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith:
>
> . . . .
>
>> (v) Every agreement or contract for the sale of real estate, or the lease thereof, for more than one (1) year[.]

[¶ 29]    In order to satisfy this provision,

> A valid contract to convey land must expressly contain a description of the land, certain in itself or capable of being rendered certain by reference to an extrinsic source which the writing itself designates. . . . The writing's essential provisions may not be supplied by inferences or presumptions deduced from oral testimony. Parol evidence is admissible to identify described property, but parol evidence may not supply a portion of the description.

*Pullar v. Huelle,* 2003 WY 90, ¶ 10, 73 P.3d 1038, 1040 (Wyo.2003). It has long been the rule that in order to satisfy the statute, the writing "must contain the substantial terms of the contract, expressed with such certainty that they may be understood from the contract itself, or some other writing to which it refers, without resorting to parol evidence. . . . And when reference is made in the memorandum to another writing, it must be so clear as to prevent the possibility of one paper being substituted for another." *Noland v. Haywood,* 46 Wyo. 101, 23 P.2d 845, 846 (1933).

[¶ 30]    The 1998 Assignment and Exhibit A clearly identified the well, Federal 44–4, and its specific location, Section 4–T53N–R75W. Comet knew Federal 44–4 was located on BLM Lease # WYW 0309256A. Even if it had not, the identity of the lease, which contains an exact description of the land, was readily determinable by knowing the identity of the well. Thus, by referencing the well, the assignment referenced an extrinsic source from which the precise property description could be easily obtained.

[¶ 31]    Additionally, as between the parties to the 1998 Assignment, Forcenergy and Powder River, there was no misunderstanding or uncertainty about the property being assigned. Forcenergy intended to convey, and Powder River intended to receive, all of Forcenergy's right, title and interest in the well and the lease upon which the well was located. The alleged uncertainty arose over six years later when Comet, then a stranger to the 1998 Assignment, proposed to Forcenergy that it had conveyed only a wellbore interest and asked Forcenergy to quitclaim the balance of the lease to Comet.

[¶ 32]    The district court found that prior to approaching Forcenergy, Comet knew Powder River believed it owned the well and the lease in full, and that Comet itself had indicated Powder River had full ownership of the lease and well. When Comet approached Forcenergy about the Federal 44–4 lease, Forcenergy checked its records and found nothing relating to the lease. Forcenergy advised Comet that it had no records of the lease or any ownership of it. Forcenergy told Comet if, after doing its own records check, Comet was convinced Forcenergy owned an interest in the lease, Forcenergy would convey it to Comet but would not warrant title.

[¶ 33]    In *Laverents,* 150 P.2d at 871, this Court said:

> The statute [of frauds] cannot be raised by those who were neither parties nor privies to the agreement. When the vendor admits the truth of the . . . agreement to sell his land, and is willing to perform it, and where the purchaser is also willing, the purpose which requires such agreement be in writing is served. . . .

*See also* Joseph M. Perillo, *Calamari and Perillo on Contracts* § 1935 (6th ed.2009) ("the general rule is that the statute of frauds is personal to the party to the contract and those in privity; a third party may not assert its invalidity . . .") and 10 Richard

A. Lord, *Williston on Contracts* § 27:12 (4th ed. 1999) ("It is the intent and purpose of the statute of frauds to give to the party to a . . . contract, against whom the enforcement of the contract is sought by the other party, the right to assert the statute as a defense to his or her own liability. A third party should not be able to assert the invalidity of such transaction unless he or she is an assignee or successor to a party to the contract.")

[¶ 34] As applied to the facts of this case, in the event Powder River sought to enforce the assignment against Forcenergy, or vice versa, the statute of frauds was intended to give "the party to be charged" the right to assert the statute as a defense to liability. Neither Powder River nor Forcenergy sought to enforce the assignment against the other. Rather, in an action against Comet, Powder River sought a declaratory judgment that by virtue of the 1998 Assignment it acquired full ownership in the well and lease, leaving nothing for Forcenergy to convey to Comet. Because Forcenergy agreed that it intended to assign all of its interest in the well and lease to Powder River, it has no need to assert the protection the statute affords.

[¶ 35] Comet asserts the statute is available to it as a defense because as a subsequent purchaser from Forcenergy, it is a privy of Forcenergy entitled to assert the statute to the same extent Forcenergy would have been. A "privy" is "a person who is in privity with another." *Black's Law Dictionary* 1200 (6th ed.1992). Privity means a "connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece of property)...." *Osborn v. Kilts,* 2006 WY 142, ¶ 10 n. 4, 145 P.3d 1264, 1267 n. 4 (Wyo.2006), quoting *Black's Law Dictionary* 1237 (8th ed.2004).

[¶ 36] As a privy of Forcenergy, Comet had the same legally recognized interest in the Federal 44–4 well and the lease upon which it was located as Forcenergy had. Comet also had the same legally recognized interest in asserting the statute of frauds

defense as Forcenergy would have had in a proceeding between Forcenergy and Powder River to enforce the assignment. Having taken the position that it assigned all of its ownership interest in the well and the lease to Powder River in 1998, Forcenergy had no interest in the Federal 44–4 well or lease. The vendor, Forcenergy, having admitted the truth of the assignment to convey all of its ownership in the well and lease to Powder River, and having fully performed, and the purchaser, Powder River, having likewise fully performed, the purpose of the statute of frauds was served. *Laverents,* 150 P.2d at 871. Under these circumstances, the statute of frauds defense was not available to Comet.

[¶ 37] Citing a number of cases from other jurisdictions, Comet argues otherwise. The cases cited involved vendors who entered into oral agreements to sell property to one person and then repudiated the earlier oral agreement and sold the property to someone else, thereby treating the oral agreement as unenforceable. *Brought v. Howard,* 30 Ariz. 522, 249 P. 76, 80 (1926); *Gibson v. Stalnaker,* 87 W.Va. 710, 106 S.E. 243 (1921). Under those circumstances, courts have held that the statute of frauds is available to the subsequent purchaser just as it would have been to the vendor. None of the cases cited involved the situation we have here in which a vendor of property entered into a written assignment to sell all of its interest in property to another and never repudiated that assignment. The cases Comet cites also do not involve a vendor who consistently maintained the position that it conveyed all that it had in the first transaction, leaving nothing to convey in a second transaction.

[¶ 38] Affirmed.