**Ben H. SVACEK, Appellant,**

v.

**Rose SHELLEY, Appellee.**

**No. 55.**

Supreme Court of Alaska.

Feb. 1, 1961.

---

19. See Annotation, 1951, 17 A.L.R.2d 527.

Bailey E. Bell, Anchorage, for appellant.

Wendell P. Kay, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

### AREND, Justice.

This is an action by the plaintiff, who is the appellant here, to recover damages for personal injuries received when he was assaulted by one Williamson, an employee of the defendant, Rose Shelley. Williamson was named in the complaint as a party defendant. He did not appear at the trial of the case, though he was represented by the same counsel who represented the defendant, Rose Shelley. The jury brought in a verdict for damages against Williamson and a directed verdict in favor of Rose Shelley. The plaintiff has appealed from the directed verdict and that portion of the judgment which dismissed the plaintiff's cause of action (claim) against her.

As to the defendant, Rose Shelley, the complaint alleges in substance that the plaintiff during the winter and spring of 1958 was employed by Shelley as a painter of her properties and occupied a basement room at her home; that Williamson also lived there, although his relationship to Shelley was not known to the plaintiff; and that Williamson had the reputation of being a dangerous man—a "knifer"—who committed acts of violence with a knife, as Rose Shelley well knew. It is further alleged that one evening as plaintiff was getting ready to retire Rose Shelley shouted to warn him to lock his door as Williamson was coming after him with a butcher knife to kill him; that the plaintiff locked the only door to his room, but Williamson broke down the door and attacked the plaintiff, inflicting serious and permanent injuries upon him with the knife. The defendant, Rose Shelley, could have called the police by telephone from her room but allegedly failed and neglected to do so. Rose Shelley is also charged in the complaint with knowingly harboring Williamson as a dangerous man, and carrying false rumors to him concerning her pretended marriage to the plaintiff in order to make Williamson jealous and to create friction between him and the plaintiff, thus causing or at least contributing to the felonious assault. Rose Shelley denied all the allegations of the complaint.

The testimony indicated the following: Rose Shelley was operating rental apartments in Anchorage, at 324 East Third Avenue and at Fourth and Unga Streets. About April 1, 1958, the plaintiff, a roofer by trade, moved into one of the basement apartments at 324 East Third Avenue to do some work around the premises for the

defendant Shelley. At the time Williamson was also occupying an apartment there on the first floor. As Williamson was a plumber, defendant Shelley had arranged with him to do plumbing work on her properties in return for the use of his apartment and $25 per month. The plaintiff had known Williamson for three or four years and occasionally drank with him. He knew of Williamson's reputation as a knifer, Rose Shelley having been one of the persons who told him before the attack that Williamson was a knifer and a vicious person, but he "didn't pay any mind to it" because he and Williamson had never had any trouble. Other witnesses testified that Williamson had the reputation of being a knifer prior to the attack upon the plaintiff. Rose Shelley denied that she knew of Williamson's reputation, but admitted she knew that he had been in a fight at her establishment and that she had been warned that she should not have him around but she claimed that she needed him to do her plumbing work.

On April 15, 1958, Williamson went in Rose Shelley's car to do some minor plumbing work for her at Unga and Fourth Streets. The plaintiff went along, at Rose's request, to see that the car got back. After that, Williamson delivered a truck for Rose from one garage to another, then he bought a pint of whiskey from which he and the plaintiff had a couple of drinks. Shortly thereafter he and the plaintiff drove the car to Spenard where Williamson had some more work to do. The record does not indicate whether this work was also for Rose. At Spenard the plaintiff was left waiting in the car; and, when, after two hours, Williamson did not return, the plaintiff drove the car back to Anchorage and delivered the keys to Rose and went to his own apartment. About five or ten minutes later Rose called down to him to lock his

door as Williamson was coming after him with a butcher knife to kill him. She did not call the police. She stated that both men were drunk when they came in. Williamson was very angry and had a knife stuck in his pocket which he had gotten from his apartment. The allegations of the complaint regarding the actual attack upon the plaintiff and the injuries resulting therefrom are borne out by the evidence produced at the trial.

In his complaint, the plaintiff alleged that Williamson was living in the home of Rose Shelley but that he does not know the nature of their relationship. The evidence indicated that the relationship was that of master and servant; and there may also have existed a landlord-tenant relationship, since Williamson was using one of Rose's apartments and paying the rent therefor by doing work for her.[1] The record does not indicate that the complaint was ever amended to allege the true relationship. The defendant in her brief assumes that the plaintiff is relying upon both types of relationship in his contention that the case against the defendant for "harboring a dangerous knifer" and "employing a dangerous person" should have gone to the jury, and then argues against any liability as to herself under the existence of either relationship. In his reply brief, the plaintiff says that he does not rely upon that portion of the evidence which deals with the landlord-tenant relationship. That may well be, but in this case it would have been helpful if the pleadings had been amended to conform to the evidence relating to the nature of the relationship in question.

■ Since it is evident in this case that Williamson, at the time of his attack upon the plaintiff was a servant of his master, the defendant Rose Shelley, the first question for us to consider is whether under the facts of this case Rose Shelley can be

1. The conditions under which a person may occupy premises as a tenant and yet be the servant of the owner are discussed in the following cases: Lesser v. Great Lakes Casualty Co., 1943, 171 Or. 174, 135 P.2d 810, 815; Turner v. Mertz, 1925, 55 App.D.C. 177, 3 F.2d 348, 39 A.L.R. 1140; Annotation 39 A.L.R. 1145 (1925); McWatters v. Union Oil Co. of California, D.C.N.D.Cal.1948, 80 F.Supp. 732.

held liable as a matter of law for retaining Williamson in her employ, knowing, or having reason to know, that he was a violent and dangerous person to have on the premises. In spite of plaintiff's insistence to the contrary, the record does not establish that Williamson was on twenty-four hour call by Rose on April 15, 1958, or that he was in fact performing work for her at the time of the attack or just prior thereto.

There are a number of cases which hold that an employer is liable to a third person for injuries inflicted upon him by an employee who has been retained in employment after the employer knows, or ought to know, that because of his incompetency or vicious propensities he is likely to assault persons *during the course of his employment.*[2] By no stretch of the imagination can one say that Williamson, who was hired solely as a plumber, was acting within the scope of his employment, that is, in the accomplishment of any of the objects of his employment,[3] when he attacked the plaintiff with a butcher knife. Plaintiff makes no claim against Rose Shelley under the doctrine of respondeat superior, realizing, no doubt, that he would not be able to prove that his attacker was acting within the scope of his employment.

Were we to stop here, we could very well conclude that the defendant Rose Shelley is not liable to the plaintiff as a matter of law under the pleadings and facts of this case. But the problem is not that simple. We are here concerned not only with making a fair adjustment of the conflicting claims between the plaintiff and Rose Shelley but also with the interests of society in general. In that respect one emi-

nent scholar and writer in the field of torts has said:

"* * * The notion of 'public policy' involved in private cases is not by any means new to tort law * * *. Society has some concern even with the single dispute involved in a particular case; but far more important than this is the system of precedent on which the entire common law is based, under which a rule once laid down is to be followed until the courts find good reason to depart from it, so that others now living and even those yet unborn may be affected by a decision made today. There is good reason, therefore, to make a conscious effort to direct the law along lines which will achieve a desirable social result, both for the present and for the future.

"* * * The administration of the law becomes a process of weighing the interests for which the plaintiff demands protection against the defendant's claim to untrammeled freedom in the furtherance of his own desires, together with the importance of those desires themselves. When the interest of the public is thrown into the scale and allowed to swing the balance for or against the plaintiff, the result is a form of 'social engineering' that deliberately seeks to use the law as an instrument to promote that 'greatest happiness of the greatest number', which by common consent is the object of society. * * *" Prosser, Torts, § 3 (2d ed. 1955).[4]

In the case of Mallory v. O'Neil, Fla. 1954, 69 So.2d 313, 315 it was alleged in

---

2. This rule is discussed and the authorities in support thereof are set forth in 40 A.L.R. 1212, at pages 1215–1219 (1926); Annotation 34 A.L.R.2d 372, at pages 390–395 (1954); Murray v. Modoc State Bank, 1957, 181 Kan. 642, 313 P. 2d 304, 309–312.

3. Novick v. Gouldsberry, 9 Cir., 1949, 173 F.2d 496.

4. Dean Pound agrees that: "The social interest in the general security is the

interest to be promoted and main-tained * * *

"* * * Liability for negligence is not necessarily a matter of a special duty toward the injured person. It is rather a matter of the threat to the general security to which the injured person is entitled." 5 Pound, Jurisprudence, Ch. 32, at pages 316–319 (1959).

the second cause of action of the complaint that the defendant, an apartment house owner, negligently kept in her employ a servant who she knew, or should have known, had vicious propensities and was a dangerous character. The duties of this servant were to make minor repairs, water the grass, hear complaints, and keep the apartment house in rentable condition. He occupied one of the apartments. While under such an employment arrangement with his master, the servant obtained a gun from his apartment, returned and shot the plaintiff, crippling her for life. From reading the opinion in the case, we gather that the plaintiff was a tenant of the defendant at the apartment house. The plaintiff appealed from a final judgment dismissing the complaint. In reversing the case as to the second cause of action, the supreme court of Florida said:

"Other jurisdictions have considered the negligence of the master in knowingly keeping a dangerous servant on the premises and have held the master liable for the acts of his servant *outside the scope of his authority if trespassing on the rights of those legally on the master's premises* [emphasis supplied] whether the servant acted wilfully, maliciously or negligently, [Citing cases].

"The doctrine of these cases was approved in Restatement of Torts § 317. It seems to be a sound rule and should be applied in this case * * *." [5]

In line with the rule announced in the Mallory case, the cases we have cited in the margin below, and the principle that regard should be had for the general security when liability for negligence of one individual to another is being considered, we hold that the case now before us should have gone to the jury on the question of whether the defendant Rose Shelley was negligent in employing Williamson or in retaining him in her service. This is especially so since the very nature of the employment arrangement permitted Williamson, even if it did not always require him, to be on the master's premises at all hours of the day. He was on the premises as a result of his employment when he attacked the plaintiff, in fact, collecting his compensation by use of a facility regularly sold by his employer to the public.

Although there is a conflict in the testimony on the point, let us assume that this defendant did employ Williamson, knowing at the time, or having reason to know, that he was a dangerous person, or that she retained him in her service after she learned of his dangerous propensities or should have known thereof. If, then, while

5. See also Fleming v. Bronfin, D.C.Mun. App.1951, 80 A.2d 915; La Lone v. Smith, 1951, 39 Wash.2d 167, 234 P.2d 893, another apartment house case; Jones v. Alden Mills, 1928, 150 Miss. 90, 116 So. 438. In the case last cited, the court held that it was error to instruct the jury to return a verdict in favor of the defendant in the light of testimony to the effect that the defendant employer was negligent in retaining in its employ a servant whom it knew to have vicious propensities. The plaintiff, while on the employer's premises as an invitee, was cut with a knife and wounded by the servant. There is nothing in the opinion to indicate otherwise than that the servant was acting entirely outside the scope of his authority when he attacked the plaintiff.

The applicable portion of § 317 of Restatement, Torts (1934) reads:

"A master is under a duty to exercise reasonable care so to control his servant while acting outside the course of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

"(a) the servant

"(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, * * *.

"(b) the master

"(i) knows or has reason to know that he has the ability to control his servant, and

"(ii) knows or should know of the necessity and opportunity for exercising such control."

**132**

on the premises of his employer, Rose Shelley, Williamson wilfully or maliciously harmed a tenant of the employer, or any other member of the public, for that matter, rightfully upon those same premises, shall the employer be heard to say that she is not liable under the law because Williamson was acting outside the scope and course of his employment, or because he was not on duty, at the time he committed the tort? Under the rule of law which we have chosen to apply here, the answer is obviously, no.

■ It was the defendant, Rose Shelley, who moved for a directed verdict in her favor. Under those circumstances the complaint and the evidence must be construed liberally and favorably to the plaintiff.[6] So construed, they raised questions of fact whether the defendant, Rose Shelley, had neglected her duty and whether such neglect resulted in injury to the plaintiff. Those questions should have gone to the jury, under proper instructions, of course.

Reversed and remanded for a new trial.

6. Phillips v. Colfax Co., Inc., 1952, 195 Or. 285, 243 P.2d 276, 245 P.2d 898, 899;

Addison v. Tessier, 1957, 62 N.M. 120, 305 P.2d 1067, 1070.