2012 WY 60

**SHAW CONSTRUCTION, LLC, a Colorado limited liability company, Appellant (Defendant),**

v.

**ROCKY MOUNTAIN HARDWARE, INC., an Idaho Corporation, Appellee (Plaintiff).**

No. S–11–0171.

Supreme Court of Wyoming.

April 18, 2012.

Representing Appellant: Peter F. Moyer, Jackson, Wyoming.

Representing Appellee: Mark D. Sullivan, Mark D. Sullivan, P.C., Wilson, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1]   Shaw Construction, LLC (Shaw) appeals from the district court's order requiring it to pay for hardware furnished by Rocky Mountain Hardware, Inc. (RMH) on a construction project owned by Snake River Sporting Club, Inc. (Snake River).   The dis-

trict court also awarded contractual interest and attorney fees under the terms of a 2003 credit agreement between Shaw and RMH. Shaw claims the district court erred by concluding it had entered into a contract with RMH. We affirm.

## ISSUE

[¶ 2]   Shaw articulates the following issue in its appellate brief: [1]

> Is the Plaintiff entitled to contract damages, 21% interest and attorney's fees, based on a 2003 account credit application signed solely by an unknown "guarantor" over 4 years prior to a 2008 construction job, where the district court expressly found that there was no contract between the parties for the 2008 job?

RMH rephrases the issue as:

> Should this Court overturn a district court decision that is fully supported by the evidence presented at trial?

## FACTS

[¶ 3]   Shaw and RMH had worked together for several years before the project at issue in this case.   In 2003, Shaw completed an application to obtain a line of credit from RMH. After reviewing Shaw's references, RMH approved a credit line of $10,000, subject to the following terms: the balance would be payable "net 10," which meant payment would be due by the 10th day of the month following the purchase;  any unpaid balance would accrue 1.75% interest per month;  and RMH would be entitled to legal fees and costs associated with collecting delinquent balances.   Over the years, RMH supplied hardware for several jobs on which Shaw was the general contractor, and Shaw promptly paid all of its bills.

[¶ 4]   In 2007, Shaw became involved with the construction of a members lodge for Snake River.   There was originally another

---

1.  Shaw used a font size in its brief which does not meet the requirements of the Wyoming Rules of Appellate Procedure.  W.R.A.P. 7.05(b)(3) requires:  "Briefs must be in no smaller type or font than 10 characters per inch.  Fonts for word processors that will appear as no smaller than 10 characters per inch are Times New Roman 13, CG Times 13, or Courier 12."  The Clerk of the Wyoming Supreme Court measured the font used by Shaw at 16 characters per inch, which is much too small.  We strongly encourage all litigants to familiarize themselves with the Wyoming Rules of Appellate Procedure and follow them in preparing their briefs.

general contractor on the job, but that relationship ended. Shaw took over the project as construction manager, rather than general contractor.

[¶ 5] On February 21, 2008, Shaw issued a Request for Proposal (RFP) for outstanding needs on the job. The RFP referred repeatedly to "subcontractors," although Shaw employees testified that was an error since Shaw was not acting as general contractor. Attachment C to the RFP included the following statement at the top: "CONTRACT TO BE ISSUED BY SNAKE RIVER SPORTING CLUB," but then stated that all "successful Subcontractors will be required to execute an agreement using the Shaw Builders LLC subcontract...." The RFP also included information regarding pay applications in Attachment F. That provision stated:

All subcontractors will be required to fill out this pay application each month and turn into Shaw Construction for approval by the 20th of each month. Payment from the **Snake River Sporting Club** should be expected by the 15th of the following month if all information is correct and able to be validated in a timely manner.

(Emphasis in original.)

[¶ 6] Although RMH was chosen as the hardware supplier, no separate contract was ever executed between RMH and either Shaw or Snake River. Nevertheless, Shaw ordered the hardware and RMH delivered it to the Snake River project from May through August 2008. It invoiced Shaw a total of $31,131.17, referencing Shaw's credit account with RMH. None of the balance due was paid and, in mid-August 2008, Shaw notified RMH that it needed to submit its bills to Snake River. RMH subsequently filed a lien against the project, and Snake River declared bankruptcy.

[¶ 7] RMH filed the instant action against Shaw, claiming Shaw was obligated to pay the outstanding balance. RMH asserted that it had a written contract with Shaw by virtue of the 2003 credit agreement, which entitled it to payment for the hardware, as well as, legal fees and interest. It also asserted claims for breach of oral contract and quantum meruit. Shaw defended on the grounds

that it was simply acting as construction manager on the job and Snake River was responsible for all payments to suppliers.

[¶ 8] The district court held a bench trial on January 6, 2011, and, at the conclusion, ruled in favor of RMH. Shaw appealed.

## STANDARD OF REVIEW

[¶ 9] Because this case was tried to the district court, we apply the following standard of review:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006) (citations omitted).

[W]e assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.

*Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC,* 2010 WY 82, ¶ 9, 239 P.3d 382, 386 (Wyo.2010), quoting *Cook v. Eddy,* 2008 WY 111, ¶ 6, 193 P.3d 705, 708 (Wyo.2008). The district court's conclusions of law are reviewed *de novo. Id.*

## DISCUSSION

[¶ 10] The district court's Findings of Fact, Conclusions of Law and Judgment included the following rulings:

**B. RMH Approved Shaw's Credit Application in 2003**

3. Shaw applied for and received approval of credit from RMH in September,

2003. The terms of that credit were set forth in the application and approval, and include a 1.75% per month finance charge. That credit application states that Shaw is required to pay all collection costs, court costs and legal fees incurred to collect delinquent balances. That credit [agreement] allowed Shaw to order the manufacture of hardware by RMH.

4. Pursuant to and under the terms of that credit agreement, over a period of more than five years, Shaw Construction ordered the manufacture and delivery of hardware and accessories for a variety of construction projects in the Jackson area for which Shaw Construction was acting as the General Contractor.

**C. The Snake River Sporting Club Project**

5. Shaw assumed construction management responsibilities at the Snake River Sporting Club Members' Clubhouse Project (the "Project") in the fall of 2007 after the general contractor left the job.

6. Shaw began working with subcontractors on the Project in the fall of 2007, and began coordinating hardware orders with Rocky Mountain Hardware in early 2008.

7. Shaw issued a Request for Proposals to potential subcontractors wishing to bid on the Project on February 21, 2008.

8. The Request for Proposals nowhere identified or stated that Shaw Construction was acting as the Construction Manager for the Project, rather than as a General Contractor.

9. The Request for Proposals stated that the winning bidders on the Project would be required to enter into a Shaw Construction subcontract.

10. The Request for Proposals failed to attach the contract between Shaw and the Snake River Sporting Club, which would have disclosed to all bidders that for the Snake River Sporting Club project Shaw was acting as a construction manager, rather than a general contractor.

11. RMH responded to the Request for Proposals and provided Shaw Construction with a preliminary quote and work order for the required hardware on the Project.

12. After consultation and approval by the architect and interior designer for the Project, Shaw approved and authorized the hardware order. RMH manufactured some of the hardware, and ordered other hardware items manufactured by other suppliers for delivery to Shaw.

13. Shaw subsequently also ordered bathroom accessories for the Project, again directly ordering those accessories from RMH.

14. Shaw took delivery of the hardware and bathroom accessories in June and July of 2008.

15. RMH issued invoices to Shaw for the hardware and accessories in May, June, July and August of 2008. The invoices were addressed to Shaw, on Shaw's account with RMH, and were for hardware and accessories delivered to Shaw for the Project. The total amount of those invoices was $31,131.17.

16. In June, 2008, the Snake River Sporting Club did not pay Shaw for its work and thereafter defaulted on its obligations to Shaw.

17. Shaw thereafter notified RMH that payment for the hardware and accessories was the owner's obligation, not Shaw's, and that RMH should seek redress from the Snake River Sporting Club directly.

18. Shaw had never before communicated to RMH that RMH must enter into a contract directly with the Snake River Sporting Club. The Snake River Sporting Club therefore had no account with RMH and no contract with RMH.

19. Wade Grant, Sr., who was the Snake River Sporting Club's representative and project manager, testified for Shaw. During his testimony Mr. Grant acknowledged that he had no contract with RMH, and did not even speak with RMH's representatives.

### CONCLUSIONS OF LAW AND JUDGMENT

NOW, THEREFORE, after presentation of the parties' evidence and due consideration by the Court, the Court concludes as follows:

a. Shaw Construction and RMH had a binding contract, consisting of the specific terms of the credit application and approval coupled with subsequent oral and written agreements whereby RMH was to manufacture and provide hardware and accessories to Shaw for the Project, for which Shaw was to pay RMH.

b. Shaw Construction has defaulted on its obligation to pay RMH for the hardware and accessories Shaw ordered for the Snake River Sporting Club Project and thereby breached the parties' contract.

[¶ 11] We start our analysis with a clarification of the district court's decision. Shaw argues that the district court erred by concluding that the 2003 credit agreement, alone, provided the basis for an award to RMH in this case. Shaw's argument presents an overly narrow view of the district court's order. Paragraph a. of the district court's conclusions of law and judgment clearly indicates that, in finding Shaw contracted to pay RMH for the hardware, the district court relied upon the credit agreement, "coupled with subsequent oral and written agreements" between the parties.

[¶ 12] Despite that clear ruling, Shaw claims that the district court "expressly found that no 2008 contract" existed between Shaw and RMH. Shaw refers to the following verbal statement by the judge to support its interpretation of the district court's decision:

THE COURT: .... Some of the things that stood out to me here in the evidence is that there is absolutely no dispute, there is no evidence that Rocky Mountain Hardware had a contract with—setting aside the credit agreement—there is no evidence that Rocky Mountain Hardware had a contract with Shaw or with Snake River Sporting Club.

Again, Shaw misinterprets the district court's ruling. It is clear from the full transcript of the district court's verbal ruling and the written judgment that the district court simply meant the parties had not entered into a formal written contract with regard to the hardware for the Snake River project. The district court concluded, nevertheless, that Shaw and RMH had contracted for the hardware.

[¶ 13] We turn now to a review of whether the district court's findings are supported by the evidentiary record. The basic elements of a contract include an offer, acceptance and consideration. *Prudential Preferred Properties v. J & J Ventures, Inc.*, 859 P.2d 1267, 1272 (Wyo.1993). *See also, Western Municipal Constr. of Wyo., Inc. v. Better Living, LLC*, 2010 WY 92, ¶ 11, 234 P.3d 1223, 1228 (Wyo.2010). A party who is seeking to establish that a contract exists has the burden of proof. *See Belden v. Thorkildsen*, 2008 WY 145, ¶ 22, 197 P.3d 148, 155 (Wyo. 2008). The determination of whether a contract has been created involves a question of fact. *Hunter v. Reece*, 2011 WY 97, ¶ 13, 253 P.3d 497, 500 (Wyo.2011); *Wyoming Sawmills, Inc. v. Morris*, 756 P.2d 774, 775 (Wyo. 1988). As we stated above, we do not disturb a district court's findings of fact unless they are clearly erroneous.

[¶ 14] The record contains more than ample evidence to support the district court's determination that RMH and Shaw had contracted for the hardware. RMH presented a submittal/quote to Shaw in response to its RFP for hardware for the Snake River project. After receiving approval from the architect and interior designer, Shaw ordered the hardware from RMH. The products were delivered to Shaw. Thus, the evidence established that Shaw ordered specific products from RMH at an agreed upon price and accepted them when they were delivered. This evidence was sufficient to establish all of the requisite elements of a contract—offer, acceptance and consideration.

[¶ 15] The conclusion that Shaw entered into a hardware contract with RMH is further supported by the invoices issued by RMH, which showed that the materials were "sold to" Shaw and the amounts due were applied to Shaw's credit account with RMH. We have ruled that terms included on an invoice accompanying the delivery of materials are binding on the parties. *Joe's Concrete & Lumber, Inc. v. Concrete Works of Colo., Inc.*, 2011 WY 74, ¶¶ 4, 18–19, 252 P.3d 445, 447, 449 (Wyo.2011) (recognizing attorney fees provision on invoices was enforce-

able). The district court's finding that Shaw and RMH had entered into a contract for the hardware is not clearly erroneous.

[¶ 16] Shaw claims, nevertheless, that it did not enter into contracts with any suppliers for the Snake River project because it acted as construction manager, rather than general contractor. The difference between a construction manager and a general contractor was explained by Shaw's project superintendent, William Linton:

Q. Let's talk about some of the ways in which Shaw's role is different when it's the construction manager as opposed to the general contractor.

A. Okay.

Q. Now, as a construction manager, Shaw would not typically be in contract with individual subcontractors or vendors or suppliers; is that correct?

A. In general, yes.

Q. And so there would be no subcontractors on a construction management project. They would all be in direct contract, in theory, with the owner.

Is that right?

A. Correct in theory, yes.

Q. So there are really only contractors on those projects?

A. I think that's the correct terminology.

Q. When you're acting as the construction manager, Shaw Construction doesn't actually pay those vendors; the vendors or material men or—the contractors are paid by the owner directly. Is that right?

A. The contractors, yes.

[¶ 17] Shaw claims that the RFP alerted RMH that Shaw was the construction manager, rather than general contractor on the Snake River project and, therefore, would not be the contracting entity or ultimately responsible for payment. It also argues that the evidence showed that RMH's sales representative for the Snake River project was made aware that RMH was supposed to contract directly with the owner rather than Shaw.

[¶ 18] The district court reviewed the RFP and ruled that it was not sufficient to alert RMH that Shaw was merely a construction manager rather than a general contractor. The district court's determination is supported by the evidence. The RFP document was internally inconsistent, stating that the successful bidders would be required to enter into the standard Shaw subcontract, but also stating that all contracts would be issued by Snake River. Even Shaw employees testified that the RFP did not accurately reflect the fact that Shaw was simply a construction manager rather than a general contractor.

[¶ 19] The district court specifically found that Shaw did not communicate to RMH that it must enter into a contract directly with the owner until after the hardware had already been ordered. The evidence pertaining to RMH's knowledge of the need to contract with the owner is open to interpretation. E-mail messages exchanged by the RMH sales representative and Shaw employees when the products were ordered were admitted into evidence at the trial and, although they confirm that RMH was expecting some type of a formal contract indicating it had been awarded the job, the messages are not clear as to whether Shaw or the owner would be entering into the hardware contract with RMH. Furthermore, Shaw project superintendent William Linton's testimony about whether he had informed RMH of the need to enter into a contract directly with Snake River was equivocal. As the finder of fact, the district court had the responsibility to assess the credibility of the witnesses and weigh the evidence. We do not re-weigh disputed evidence on appeal. *Mullinnix*, ¶ 12, 126 P.3d at 916. On this record, the district court's finding that RMH was not aware that the owner would be the contracting party on the Snake River project was not clearly erroneous.

[¶ 20] In addition, even if the RMH sales representative was made aware of the fact that the owner intended to be the contracting entity on the project, that circumstance never came to fruition. RMH did not enter into a contract with the owner and, in fact, had no contact with the owner's representative. The evidence clearly demonstrates, consistent with the district court's ruling, that

RMH dealt directly with Shaw and Shaw ordered the materials.

[¶ 21] Once Shaw and RMH contracted for the hardware and RMH did not require payment up front, the terms of Shaw's credit agreement with RMH came into play. The agreement consisted of Shaw's application for credit, including a list of credit references that RMH contacted, and RMH's letter approving the line of credit.

██ [¶ 22] Shaw claims, on appeal, that the credit agreement did not satisfy the Statute of Frauds, Wyo. Stat. Ann. § 1–23–105 (LexisNexis 2011), because it was not properly subscribed, in that the Shaw representative who signed the credit application could not be identified and he or she signed only the "Personal Guarantee" portion of the application. We reject Shaw's argument for a number of reasons. First, Shaw did not sufficiently present its statute of frauds defense to the district court. Although it included the statute of frauds as an affirmative defense in its answer and there was evidence presented challenging the validity of the credit agreement, Shaw does not direct us to any place in the record where it argued the specific legal issue to the district court. We typically do not address issues raised for the first time on appeal, unless they are fundamental or jurisdictional in nature. *See, e.g., Anderson v. Bd. of County Comm'rs of Teton County,* 2009 WY 122, ¶ 15, 217 P.3d 401, 405 (Wyo.2009).

[¶ 23] Moreover, Shaw provides no cogent argument or citation of pertinent authority to support its statute of fraud claim on appeal. *J & T Properties, LLC v. Gallagher,* 2011 WY 112, ¶ 23, 256 P.3d 522, 527 (Wyo.2011). Shaw's argument consists of the following statement: "The Statute of Frauds may apply to an alleged contract such as the 2003 Account Credit Application, where there is an issue as to whether the document was properly 'subscribed' by a party to be bound thereby. W.R.S. § 1–23–105." Shaw presents no analysis of the elements of a statute of frauds defense or the possible exceptions

to application of the statute. We, therefore, decline to further address this claim.

██ [¶ 24] Under the credit agreement, Shaw agreed to pay the costs of collection, including legal fees, and interest on any unpaid balances. Although Shaw suggested that the agreement was not valid because no one could identify the Shaw representative who signed it and it was only signed in the "Personal Guarantee" space, the evidence demonstrated that the application was, in fact, authorized by Shaw as the credit references were provided on Shaw letterhead. RMH also sent Shaw a confirmatory letter, indicating the credit account had been opened and there is no indication Shaw objected. The best evidence that Shaw authorized the application and entered into the credit agreement was that following the opening of the account, Shaw and RMH operated under this agreement for several years prior to the Snake River project. The district court properly ruled the credit agreement applied in this case and, pursuant to its terms, Shaw was responsible for the principal balance due on the hardware contract, together with contractual interest and attorneys fees.[2]

[¶ 25] Affirmed.

---

2. We note that the credit agreement had an original limit of $10,000. Neither the district court nor the parties ascribe any special significance to this term, perhaps because RMH's credit and

accounts receivable manager testified that Shaw's credit limit had been increased informally over the years because of its prompt payments.