2012 WY 126

**Rodney SHAFER, individually and d/b/a Reno Transport, and Brenda Shafer, Appellants (Plaintiffs),**

v.

**TNT WELL SERVICE, INC., Appellee (Defendant).**

No. S–11–0258.

Supreme Court of Wyoming.

Sept. 26, 2012.

Representing Appellants: Brian J. Marvel and Ryan J. Schwartz, Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Schwartz.

Representing Appellee: Terry L. Armitage and Curtis B. Buchhammer, Buchhammer & Kehl, P.C., Cheyenne, Wyoming. Argument by Mr. Armitage.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1]  Appellant, Rodney Shafer, was injured when his tractor-trailer collided with a pickup owned by Appellee, TNT Well Service, Inc. ("TNT"), and driven by Melvin Clyde.  Mr. Shafer and his wife, Brenda, brought suit against TNT, asserting theories of negligence and vicarious liability for damages resulting from the accident.  The district court granted summary judgment to TNT on all of the Shafers' claims.  The Shafers challenge that decision in this appeal. We reverse.

## ISSUES

[¶ 2]  The parties raise the following issues:

1.  Did the district court properly determine there was no genuine issue of material fact that Mr. Clyde's employment with TNT Well Service, Inc. was terminated prior to the accident?

2.  Should this Court adopt the duty recognized in Restatement (Second) of Torts § 317 and, if so, whether a duty of reasonable care can be imposed on the Appellee under the facts of this case?

3.  Did the district court properly determine that the entrustment of a vehicle to Mr. Clyde was terminated prior to the accident and, if not, is there a genuine issue as to whether the entrustment was negligent?

## FACTS

[¶ 3]  Mr. Clyde was hired as a rig operator by TNT in early 2008.  In order to

perform his duties, Mr. Clyde was required to travel to various well sites within approximately 100 miles of Gillette, Wyoming. He was provided with a TNT pickup, which he also used to travel to and from his home in Upton.

[¶ 4] On February 12, 2009, at approximately 5:30 p.m., Mr. Clyde was driving to Newcastle, Wyoming in the TNT pickup when it crossed the centerline of Highway 16 and collided head-on with Mr. Shafer's tractor-trailer. Mr. Clyde was pronounced dead at the scene. A post-accident blood test revealed the presence of controlled substances in his blood. Mr. Shafer was injured in the collision, and his tractor-trailer was damaged beyond repair.

[¶ 5] The Shafers brought suit against TNT claiming that (1) TNT was vicariously liable for Mr. Clyde's negligence under the doctrine of *respondeat superior*, (2) TNT was negligent in hiring and supervising Mr. Clyde, and (3) TNT was negligent in entrusting a company vehicle to Mr. Clyde. Following discovery, TNT filed a motion for summary judgment, claiming that Mr. Clyde was not employed by TNT at the time of the accident. TNT asserted that Mr. Clyde's employment had been terminated "at least one hour before the subject collision occurred." TNT also claimed that it could not be vicariously liable for Mr. Shafer's damages because Mr. Clyde was not acting within the course and scope of his employment at the time of the accident.

[¶ 6] The district court granted TNT's motion for summary judgment on all of the Shafers' claims. With regard to the *respondeat superior* claim, the court concluded that there was no genuine issue as to whether Mr. Clyde's employment had been terminated prior to the accident. Additionally, after finding that "it is undisputed that Mr. Clyde was traveling in a direction in which his employer conducted no business, outside of working hours, on a day he had been absent from work and after he had been informed someone from the company was coming to collect the truck and he was to leave the truck in Upton," the court held that "even if an employer-employee relationship had existed between Mr. Clyde and TNT at the time

of the accident, the undisputed facts would lead to only one reasonable inference—Mr. Clyde had deviated from the course and scope of his employment and was upon a personal errand when the accident occurred."

[¶ 7] The district court also granted summary judgment on the Shafers' direct liability claims. With respect to the Shafers' claim of negligent supervision, the court concluded that summary judgment was appropriate because no employment relationship existed at the time of the accident. Similarly, the court concluded that summary judgment was appropriate on the Shafers' negligent entrustment claim because Mr. Clyde's authorization to use the TNT pickup terminated concurrently with the termination of his employment. The Shafers filed a timely appeal.

## STANDARD OF REVIEW

[¶ 8] Motions for summary judgment are governed by W.R.C.P. 56(c), which provides that "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We apply the following standard of review to the decision to grant summary judgment:

> We treat the summary judgment movant's motion as though it has been presented originally to us. We use the same materials in the record that was before the district court. Using the materials in the record, we examine them from the vantage point most favorable to the nonmoving party opposing the motion, giving that party the benefit of all favorable inferences which may fairly be drawn from the materials.... If doubt exists about the presence of genuine issues of material fact after we have reviewed the record, we resolve that doubt against the movant.

*Lamar Outdoor Adver. v. Farmers Co–Op Oil Co.*, 2009 WY 112, ¶ 10, 215 P.3d 296, 300 (Wyo.2009) (quoting *Bangs v. Schroth*, 2009 WY 20, ¶ 20, 201 P.3d 442, 452 (Wyo.2009)) (internal citations omitted).

## DISCUSSION

[¶ 9] The district court granted summary judgment after determining there was no genuine issue as to whether Mr. Clyde's employment with TNT had been terminated prior to the collision with Mr. Shafer's vehicle. The Shafers contend that Mr. Clyde's employment had not been terminated prior to the accident. The Shafers do not, however, challenge the district court's conclusion that Mr. Clyde was not acting within the course and scope of his employment at the time of the accident in this case, and, accordingly, they do not pursue their claim for recovery under a *respondeat superior* theory of vicarious liability. Rather, Appellants assert that TNT is directly liable, first, based on a duty to supervise Mr. Clyde's use of the TNT vehicle, founded in Restatement (Second) Torts § 317, and second, under a theory of negligent entrustment. The Shafers assert that these claims are viable despite the fact that an employee acts outside the scope of his employment when harm is caused. We examine the appropriateness of summary judgment on each of these theories in turn, focusing on whether the Shafers have raised a genuine issue with respect to each of the elements of their respective claims.

## I. Negligent Supervision

[¶ 10] The Shafers contend that TNT is subject to direct liability for its own negligence in failing to adequately supervise Mr. Clyde. Relying on Restatement (Second) of Torts § 317, the Shafers urge this Court to hold that TNT is directly liable for failing to exercise due care when Mr. Clyde was acting outside the scope of his employment. Section 317 provides as follows:

> A master is under a duty to *exercise reasonable care* so to control his servant *while acting outside the scope of his employment* as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
>   (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

> (ii) *is using a chattel of the master,* and
>
> (b) the master
>
>   (i) knows or has reason to know that he has the ability to control his servant, and
>
>   (ii) knows or should know of the necessity and opportunity for exercising such control.

(Emphasis added.) Unlike a claim of *respondeat superior*, a negligent supervision claim under Section 317 is not based on imputed or vicarious liability, but rather on the employer's own negligence in failing to exercise due care to protect third parties from the foreseeable tortious acts of an employee. *E.g.*, *Rausch v. Pocatello Lumber Co.*, 135 Idaho 80, 14 P.3d 1074, 1080 (App.2000). Essentially, the Shafers contend that TNT is an "actor" whose fault must be apportioned along with the fault of all other actors in this case pursuant to Wyoming's system of comparative fault, set forth at Wyo. Stat. Ann. § 1–1–109 (LexisNexis 2011).

[¶ 11] In *Killian v. Caza Drilling, Inc.*, 2006 WY 42, ¶¶ 28 n. 5, 32, 131 P.3d 975, 987 n. 5, 988 (Wyo.2006), we acknowledged that "imposition of employer liability for employee negligence has been recognized under [Section 317]," but we did not adopt or reject the duty because we determined that it was not applicable to the facts of that case. In keeping with our approach in *Killian*, before we determine whether to recognize a duty of reasonable care under the specific circumstances identified in Section 317, we first consider whether those circumstances are present in this case. Our initial task is to determine whether TNT has demonstrated the absence of a genuine issue as to the existence of each of the elements set forth in Section 317.

### A. Termination of Mr. Clyde's Employment

[¶ 12] Because Section 317 assumes the existence of an employment relationship as a predicate to liability, we first examine whether Mr. Clyde was a TNT employee when the harm in this case occurred. It is undisputed that Mr. Clyde was hired by TNT in 2008

and had worked for TNT for approximately one year before the accident occurred. It is also undisputed that TNT provided a pickup to Mr. Clyde. TNT contends, however, that Mr. Clyde's employment was terminated in a phone conversation initiated by Damion Black, Mr. Clyde's supervisor, on the day of the accident. In support of this claim in its motion for summary judgment, TNT presented deposition testimony from Mr. Black, as well as Tim Greene, TNT's owner and president, and Christina Greene, a former secretary at TNT. Each stated that Mr. Clyde's employment had been terminated prior to the accident.

[¶ 13] The Shafers, however, contend that the testimony of these witnesses is not credible. They point to inconsistencies in and among the testimonies of Mr. Greene, Mr. Black, and Ms. Greene, as well as to the testimony of Christina Anfinson, Mr. Clyde's fiancée prior to the accident. The Shafers assert that the testimony of the TNT witnesses was a "post-hoc fabrication" made to avoid liability for the harm caused by Mr. Clyde. We conclude that the Shafers raise an issue of credibility that is supported by specific facts and evidence, and which should be reserved for consideration by the trier of fact.

[¶ 14] In articulating the proper standard for summary judgment in a negligence case, we have often stated that "Summary judgment is not favored in a negligence action and is, therefore, subject to more exacting scrutiny. We have, however, affirmed summary judgment in negligence cases where the record failed to establish the existence of a genuine issue of material fact." *Cook v. Shoshone First Bank*, 2006 WY 13, ¶ 12, 126 P.3d 886, 889 (Wyo.2006) (quoting *Jones v. Schabron*, 2005 WY 65, ¶ 9, 113 P.3d 34, 37 (Wyo.2005)). We have also stated that a motion for summary judgment "should be sustained in the absence of a real and material fact issue considering movant's burden, respondent's right to the benefit of all favorable inferences and any reasonable doubt, *with credibility questions to be resolved by trial.*" *Eathorne v. Bd. of Trustees of the Mem'l Hosp.*, 2001 WY 36, ¶ 6, 21 P.3d 745, 748 (Wyo.2001) (emphasis added) (quoting

*Cordova v. Gosar*, 719 P.2d 625, 640 (Wyo. 1986)); *see also Bodily v. State ex rel. Wyo. Workers' Safety & Comp. Div. (In re Worker's Comp. Claim of Bodily)*, 2011 WY 149, ¶ 16, 265 P.3d 995, 1000 (Wyo.2011) (holding that the Office of Administrative hearings "erroneously strayed from its function at the summary judgment stage to determine whether a genuine issue of material fact as to causation existed" and "erroneously engaged in weighing all the evidence and making credibility determinations"). Indeed, we have consistently held that it is the factfinder's duty to assess the credibility of witnesses and weigh the evidence. *See Shaw Constr., LLC v. Rocky Mt. Hardware, Inc.*, 2012 WY 60, ¶ 19, 275 P.3d 1238, 1243 (Wyo. 2012); *In re Campbell County*, 731 P.2d 1174, 1177 (Wyo.1987).

[¶ 15] We find that the record reveals specific facts and evidence which undermine the credibility of Mr. Greene, Mr. Black, and Ms. Greene, and could influence the factfinder's assessment of their testimony. Mr. Greene testified that he attempted to contact Mr. Clyde several hours before the accident to inform him that his employment was terminated, but stated that he did not personally speak with him at any time prior to the collision. He stated that, after unsuccessfully trying to reach Mr. Clyde, he told Mr. Black to contact him. According to Mr. Greene, Mr. Clyde's employment was terminated pursuant to a TNT policy providing that any employee with a "one-time no call, no show" incident would be discharged. Mr. Greene acknowledged, however, that Mr. Clyde had not been terminated when he did not appear at work on February 10, two days prior to the accident, and stated that he could not recall the reason for Mr. Clyde's absence from work on that day. Further, TNT did not produce any documentation indicating that it had a "one-time no call, no show" termination policy.

[¶ 16] Mr. Black also testified that Mr. Clyde's employment had been terminated on the day of the accident. His testimony, however, was also contradicted. Mr. Black stated that he called Mr. Clyde and told him that his employment was terminated because he had not been to work that day. According to

Ms. Anfinson, however, she had been at home cleaning from 8:00 a.m. to 3:00 p.m., and, although Mr. Clyde was also at home, his phone never rang. Indeed, she testified that Mr. Clyde called Mr. Black around 3:00 p.m. on the day of the accident and requested a few days off to work on his house in Upton. She stated that "They [Mr. Greene and Mr. Black] never called [Mr. Clyde] until he called them." Further, neither party produced any phone records and there is nothing in TNT's employment records reflecting that Mr. Clyde's employment had been terminated prior to the collision.

[¶ 17] The testimony of Mr. Greene and Mr. Black was further contradicted by the testimony of Ms. Greene. Although Mr. Greene and Mr. Black both indicated that they had called Mr. Clyde on the day of the accident, and that the decision to terminate Mr. Clyde's employment had been made several hours before the collision, Ms. Greene testified that neither herself, nor Mr. Black or Mr. Greene, had spoken to Mr. Clyde on February 10, 11, or 12, but that the decision to fire Mr. Clyde had been made on the night of February 11, prior to Mr. Clyde's absence on February 12. The testimony relating to Mr. Clyde's termination was also undermined by the fact that Mr. Clyde was listed as a TNT employee on the highway patrol accident report, even though Mr. Black had arrived at the scene after the accident and had spoken to the investigating officer at that time.

[¶ 18] Finally, a more general credibility issue was raised in the testimony relating to TNT's drug testing policies. Ms. Greene testified that she had been responsible for coordinating a drug testing program for TNT through Occupational Testing, Inc., and unequivocally stated that TNT did not require prospective employees to submit to a pre-employment drug test. Mr. Greene, however, testified that "When each employee is hired they're taken down for a urine test.... And if they fail the test, or it's inconclusive, they're not hired at TNT Well Service." He stated that Mr. Clyde had submitted to a ·

drug test prior to his employment. Further, TNT asserted in its Brief in Support of Motion for Summary Judgment that "The records from Occupational Testing, Inc. in Gillette, Wyoming indicate that Clyde's pre[-]employment urinalysis was negative. *See* Exhibit 'G' attached hereto. In other words, the urinalysis revealed that Clyde did not have any controlled substances in his system as of the date of hire." The exhibit referenced by TNT, however, is a drug test conducted for a different employer, approximately eight months prior to Mr. Clyde's employment with TNT.[1]

[¶ 19] In sum, the Shafers have raised credibility issues with respect to TNT's reason for terminating Mr. Clyde's employment, the circumstances and content of the phone conversation between Mr. Clyde and Mr. Black on the day of the accident and alleged termination, documentation of Mr. Clyde's employment status, and whether Mr. Black indicated to the responding officer at the scene of the accident that Mr. Clyde was a TNT employee. Viewing the evidence in the light most favorable to the Shafers, and reserving the necessary credibility determinations for the trier of fact, we find the Shafers have raised a genuine issue of fact as to whether Mr. Clyde's employment had been terminated prior to the accident at issue in this case.

**B. Ability and Necessity to Exercise Control**

[¶ 20] The district court's analysis ended with its consideration of whether Mr. Clyde was employed by TNT at the time of the accident. However, because we evaluate TNT's motion for summary judgment as if it were presented originally to us, we proceed to determine whether the Shafers have established a genuine issue of material fact with respect to the remaining elements of Section 317. We note first that it is undisputed that Mr. Clyde was using TNT's vehicle at the time of the accident, which satisfies the first prong of Section 317. Under the second prong of Section 317, a plaintiff must

1. The exhibit also includes the results of a random drug test conducted approximately four months after his employment with TNT began.

show that the employer (i) knows or has reason to know that he has the ability to control his servant, and (ii) knows or should know of the necessity and opportunity for exercising such control. We examine each of these elements in turn.

[¶ 21] With regard to an employer's "ability to control" its employee, the Supreme Court of Illinois has noted that

> [T]he term "control" is used in section 317 "in a very real sense." 43 Yale L.J. at 891. Under section 317, "the essential basis of liability [is] *the practical opportunity for effective control arising from the general master-servant relationship* and from the connection between the dangerous conduct and the employment." (Emphasis added.) F. James, Scope of Duty in Negligence Cases, 47 Nw. U. L. Rev. 778, 812 n.183 (1953).

*Hills v. Bridgeview Little League Ass'n*, 195 Ill.2d 210, 253 Ill.Dec. 632, 745 N.E.2d 1166, 1185 (2000) (emphasis in original). We note that neither party introduced evidence to suggest that Mr. Clyde had independent authority to determine his employment responsibilities. On the contrary, the evidence presented suggests that Mr. Clyde's duties were prescribed and controlled by Mr. Black and Mr. Greene. The evidence introduced by the Shafers was sufficient to raise a genuine issue as to whether Mr. Black, as Mr. Clyde's supervisor, and certainly Mr. Greene, as the owner and president of TNT, had knowledge of their ability to control Mr. Clyde and his use of the TNT vehicle.

[¶ 22] We also conclude that the Shafers have raised a genuine issue as to whether TNT knew or should have known of the necessity and opportunity for exercising control over Mr. Clyde. Ms. Greene testified that "DUIs ... are a huge concern" in assessing the fitness of a TNT employee, and that "we shouldn't hire anybody with a DUI." Although the testimony of Mr. and Ms. Greene indicates that TNT tested its employees for drug use, their testimonies diverge with respect to the character of TNT's drug-testing program and whether Mr. Clyde was tested at the time he was hired. Although Mr. Greene stated that every prospective employee must pass a drug test as a condi-

tion of employment at TNT, and that Mr. Clyde had done so, Ms. Greene testified that employees were not subject to a pre-employment drug test, and that Mr. Clyde had not been tested.

[¶ 23] Although Ms. Greene became aware that Mr. Clyde was on probation after he was hired, she did not make an inquiry as to the offense giving rise to Mr. Clyde's probation. In the proceedings below, the Shafers produced documentary evidence indicating that, prior to his employment with TNT, Mr. Clyde had received two DUI convictions; one in 1999 and another in 2000. He had also been convicted of possession of a controlled substance in 2005. This evidence indicates that Mr. Clyde had a history of substance abuse issues and calls into question his fitness as a TNT employee. Despite the fact that Mr. Clyde's DUI convictions were several years old, it is the responsibility of the factfinder to determine whether those convictions could give rise to knowledge of the necessity of exercising control over Mr. Clyde's use of the TNT vehicle. In light of Ms. Greene's testimony that "DUIs ... are a huge concern" and that TNT "shouldn't hire anybody with a DUI"; the Greenes' apparent agreement that a drug-testing policy was prudent; and the character of Mr. Clyde's prior criminal offenses, we find the Shafers have raised a genuine issue with regard to whether TNT should have known of the necessity of controlling Mr. Clyde's use of a company vehicle.

### C. Duty to Exercise Reasonable Care Under § 317

[¶ 24] As the discussion above indicates, the Shafers have raised a genuine issue with respect to each of the elements identified in Section 317. Because we have concluded that the duty is applicable to the facts of the present case, our next task is to consider whether this duty should be recognized in Wyoming. Whether a legal duty exists is a question of law. *Killian*, ¶ 8, 131 P.3d at 979. As noted in *Killian*,

> Duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled

to protection.... A duty may arise by contract, statute, common law, or when the relationship of the parties is such that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff. The legal question to be answered by the court is

> [w]hether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other-or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant. This is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court.

*Id.,* ¶ 8, 131 P.3d at 979–80 (quoting *Borns ex rel. Gannon v. Voss,* 2003 WY 74, ¶ 30, 70 P.3d 262, 273 (Wyo.2003)) (internal citations and quotation marks omitted).

[¶ 25] Generally, in determining whether a duty exists, we employ the factors set forth in *Gates v. Richardson,* 719 P.2d 193, 196 (Wyo.1986), including the foreseeability of harm to the plaintiff, the closeness of the connection between the defendant's conduct and the injury suffered, and the consequences to the community and the court system. In this case, however, we need only return to the original inquiry of whether the relationship between these parties is such that "the community will impose a legal obligation upon one for the benefit of the other." In *Killian,* we noted that the law "generally recognizes" that liability may be imposed when an employee "is acting outside the scope of his employment but is on the employer's premises or is using the chattel of the employer and the employer knows or has reason to know that it has the ability and opportunity to control the employee pursuant to Restatement (Second) of Torts § 317." *Id.,* ¶ 28, 131 P.3d at 987. Consistent with the statement in *Killian,* our research confirms that the question of "whether the interest of the plaintiff which has suffered invasion [is] entitled to legal protection at the hands of the defendant" has been

answered affirmatively in the great majority of jurisdictions that have considered whether to impose the duty identified in Section 317. *See, e.g., Svacek v. Shelley,* 359 P.2d 127, 131 (Alaska 1961); *Keller v. Koca,* 111 P.3d 445, 448–49 (Colo.2005); *Murdock v. Croughwell,* 268 Conn. 559, 848 A.2d 363, 369 (2004); *Malicki v. Doe,* 814 So.2d 347, 361–62 (Fla. 2002); *Wong–Leong v. Hawaiian Indep. Refinery,* 76 Hawai'i 433, 879 P.2d 538, 550 (1994); *Rausch,* 14 P.3d at 1080; *Hills v. Bridgeview Little League Ass'n,* 195 Ill.2d 210, 253 Ill.Dec. 632, 745 N.E.2d 1166, 1180–81 (2000); *Sandage v. Bd. of Comm'rs,* 897 N.E.2d 507, 511–12 (Ind.Ct.App.2008); *D.W. v. Bliss,* 279 Kan. 726, 112 P.3d 232, 239 (2004); *Dragomir v. Spring Harbor Hosp.,* 970 A.2d 310, 315 (Me.2009); *Farr v. Cambridge Co-operative Oil Co.,* 164 Neb. 45, 81 N.W.2d 597, 600 (1957); *Trahan–Laroche v. Lockheed Sanders,* 139 N.H. 483, 657 A.2d 417, 419 (1995); *Di Cosala v. Kay,* 91 N.J. 159, 450 A.2d 508, 515 (N.J.1982); *Ford v. Grand Union Co.,* 268 N.Y. 243, 197 N.E. 266, 270–71 (1935); *Nelson v. Gillette,* 571 N.W.2d 332, 340–41 (N.D.1997); *Kerans v. Porter Paint Co.,* 61 Ohio St.3d 486, 575 N.E.2d 428, 432 (1991); *Dempsey v. Walso Bureau, Inc.,* 431 Pa. 562, 246 A.2d 418, 420–22 (1968); *Degenhart v. Knights of Columbus,* 309 S.C. 114, 420 S.E.2d 495, 496 (1992); *Kirlin v. Halverson,* 758 N.W.2d 436, 449–51 (S.D.2008); *Kelsey–Seybold Clinic v. MacLay,* 466 S.W.2d 716, 720 (1971); *Jackson v. Righter,* 891 P.2d 1387, 1392 (Utah 1995); *Bradley v. H.A. Manosh Corp.,* 157 Vt. 477, 601 A.2d 978, 981 (1991); *Niece v. Elmview Group Home,* 131 Wash.2d 39, 929 P.2d 420, 427 (1997).

[¶ 26] We find no reason to depart from the conclusions reached in these jurisdictions as to whether societal norms impose a duty upon an employer to exercise reasonable care for the benefit of third parties in supervising employees while on the employer's premises or using the employer's chattel. Further, we are satisfied that the policy considerations relevant to imposition of a duty are weighted in favor of recognizing an employer's duty to supervise its employees as set forth in Section 317. Accordingly, we agree with the Shafers that an employer's

failure to supervise an employee using an employer's chattel while acting outside the scope of his employment gives rise to the potential for liability. Because the Shafers have demonstrated a genuine issue as· to the existence of each of the elements identified in Section 317, we reverse the district court's grant of summary judgment with respect to the Shafers' claim of negligent supervision.

## II. Negligent Entrustment

[¶ 27] The Shafers also contend that TNT was negligent in entrusting the vehicle to Mr. Clyde. We explained the theory of negligent entrustment in *Moore v. Kiljander*, 604 P.2d 204, 206 (Wyo.1979) as follows:

> The general rule is that in order to establish liability under the theory of negligent entrustment the plaintiff must prove that the entruster was negligent in supplying the instrumentality to an incompetent person. *Upland Mutual Insurance, Inc. v. Noel*, 214 Kan. 145, 519 P.2d 737, 742 (1974). To meet this burden the plaintiff must show that the entruster either knew or should have known that the person to whom the instrumentality was entrusted was incompetent. *Finch v. Canaday*, 75 Wyo. 472, 297 P.2d 594, 598 (1956); Second Restatement of Torts, § 390 (1965). The authors of the Second Restatement of Torts have described the tort of negligent entrustment in the following manner:
>
> > "1. 'One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.' (Rest. Torts 2d, § 390.)"

The determination of liability for negligent entrustment is not tied to the existence of an employment relationship, and does not depend on whether an employee is acting in the course and scope of his employment when harm occurs. Liability for negligent entrust-

ment arises from the act of entrustment, not the relationship of the parties. 57A Am. Jur.2d *Negligence* § 319 (citing *Todd v. Dow*, 19 Cal.App.4th 253, 23 Cal.Rptr.2d 490 (1993); *Mathis v. Stacy*, 606 S.W.2d 290 (Tenn.Ct.App.1980)). Consequently, in light of the standards set forth above, we need only determine whether a genuine issue exists as to (1) whether TNT supplied the chattel to Mr. Clyde, and (2) whether TNT knew or should have known that Mr. Clyde was likely to use the TNT pickup in a manner involving an unreasonable risk of harm.

[¶ 28] With regard to the first element of negligent entrustment, it is undisputed that TNT supplied the pickup that Mr. Clyde was driving at the time of the accident. Accordingly, we find the Shafers have satisfied this element. Further, we find that the Shafers have presented a genuine issue as to whether TNT knew or should have known that the vehicle was entrusted to an incompetent person. Our analysis of this element is similar to the determination of whether TNT knew or should have known of the necessity and opportunity for exercising control, as set forth in the above discussion of liability under Restatement (Second) of Torts § 317. As in that analysis, we find that Ms. Greene's testimony relating to the relevance of DUI convictions to employee fitness, the existence of a drug-testing program at TNT, and Mr. Clyde's prior DUI and controlled substance convictions constitute specific facts and evidence which raise a genuine issue as to whether TNT should have known that entrustment of a vehicle to Mr. Clyde was likely to involve an unreasonable risk of harm.

[¶ 29] The district court did not address the elements of negligent entrustment in granting TNT's motion for summary judgment. Instead, the court determined that the claim for negligent entrustment was not viable because Mr. Clyde's employment had been terminated prior to the accident. The district court cited 23 Causes of Action 2d 265 (2003) for the proposition that

> The entrustment must be voluntary on the part of the owner, or other person in control, and effective to give possession and control of the motor vehicle to the entrus-

tee. An unauthorized, non-permissive use of another's motor vehicle is, as a matter of law, insufficient to establish the owner's liability for negligent entrustment.

The district court concluded that, because TNT had "put forward evidence showing Mr. Clyde's employment with TNT was terminated prior to the accident and Mr. Clyde had no authorization to use the TNT vehicle at the time the accident occurred," TNT could not be liable for negligent entrustment.

[¶ 30] As our previous discussion indicates, we have already determined that a genuine issue of fact remains as to whether Mr. Clyde's employment with TNT had, in fact, been terminated prior to the accident. Because it is not clear that Mr. Clyde's employment had been terminated before the collision, we must reject the district court's analysis of the Shafers' negligent entrustment claim. We also note that the district court's analysis assumes that an entrustment may be terminated by the entrustor prior to the point at which the entrustor regains possession of the property. We need not decide whether that assumption is correct in this appeal. However, we note that the cases relied upon by the district court for the proposition that "An unauthorized, non-permissive use of another's motor vehicle is, as a matter of law, insufficient to establish the owner's liability for negligent entrustment," are distinguishable. This rule finds its origins in cases in which the entrustment was not authorized *at its inception*; i.e. where property was taken without the consent of the owner. *See, e.g., Beckendorf v. Simmons,* 539 S.W.2d 31 (Tenn.1976) (involving an unauthorized *taking* of the vehicle from the custody of the owner); *Central Mut. Ins. Co. v. Cain,* 377 So.2d 579, 581 (La.Ct.App.3d Cir.1979) (noting that the owner of the vehicle "steadfastly refused to voluntarily turn over the keys" to the negligent driver); *State Farm Mut. Auto. Ins. Co. of Bloomington, Illinois v. Dellwo,* 300 Minn. 409, 220 N.W.2d 367 (1974) (owner of vehicle was not aware that drivers were starting and using the vehicle by means of a knife or the removal of the ignition cylinder). In the present case, however, the evidence indicated that Mr. Clyde had express authorization to use the TNT vehicle at the time that it was initially entrusted to him.

[¶ 31] For the foregoing reasons, we find that summary judgment was erroneously granted with respect to the Shafers' claims of negligent supervision and negligent entrustment. Reversed and remanded for further proceedings consistent with this opinion.